SANTA FE PACIFIC RAILROAD COMPANY *v.* HOLMES.

ERROR TO THE UNITED STATES CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 235. Argued April 18, 19, 1906.—Decided May 21, 1906.

The duty of the master to furnish safe places for the employés to work in and safe appliances to work with is a continuing one to be exercised wherever circumstances require it.

While the duty of the master—in this case a railroad company—may be, and frequently is, discharged by one exercise it may recur at any moment in keeping trains in safe relation. A train dispatcher is not relieved, nor does he relieve the company, by the promulgation of an order; he must at all times know and guard against possible changes, and, under the circumstances of this case, *held* that a collision causing injuries to an engineer was the result of the dispatcher's negligence in failing to take into account and do what a prudent man would have taken into account and done.

In this case the dispatcher was the representative of the company to promulgate orders for the running of trains and not a fellow servant of the engineer.

ACTION brought in the Circuit Court of the United States for the Ninth Circuit, Southern District of California, by defendant in error, for damages for injuries received by him in a head-on collision of two trains, on one of which he was an engineer. The answer alleged negligence upon the part of defendant in error, by disobeying the orders, rules and regulations of the company, and also alleged that the collision was

caused by the negligence of a fellow servant. The action was tried without a jury, and the Circuit Court found for defendant in error in the amount of $9,000, and entered judgment against the company for that sum. The judgment was affirmed by the Circuit Court of Appeals. 136 Fed. Rep. 66. The company, being a Federal corporation, then sued out this writ of error.

The colliding trains were regular passenger trains, and are denominated in the testimony as train No. 3 and train No. 4, the former being westbound and the latter eastbound. Defendant in error was the engineer on No. 4, or rather one of the engineers, the train being hauled by two engines. He was the engineer of the second engine. Both trains were run on regular schedule or time cards, when on time or slightly delayed, No. 4 having the right of track. On the morning of the collision, November 20, 1901, train No. 3 was unusually delayed, and special orders became necessary for the operation of the trains on the Arizona division. The first order was issued before train No. 4 had left Needles. The order was as follows: "No. 3 eng. 482 has right of track over No. 4 eng. 444 and 452 to Needles, but will run 1 hour 50 minutes late Kingman to Needles." The copy of the order was delivered to train No. 4 before 4.22 A. M., before its departure from Needles, and to No. 3 upon its arrival at Kingman at 4.21 or 4.22 A. M. Train No. 4 ran east to Mellen, a distance of 11.9 miles, where it stopped upon signal. In the meantime the second order (No. 23) was issued by the train dispatcher, train No. 3 having been more delayed in arriving at Kingman than had been expected.° This order was delivered to train No. 4 at Mellen. It read as follows: "No. 3 eng. 482 will run two (2) hours late Kingman to Needles." A copy of the order was delivered to No. 3 at Kingman. The effect of these orders and the general rules of the company was that No. 3 was to run according to the time card, except that it was to run two hours late and was to have the right of track over No. 4, the latter to look out for No. 3, and run with refer-

ence to its movement as provided for by the special orders in connection with the time-table. The orders and the time-table would have made Franconia the proper place of passing of the trains, No. 3 being due to arrive there at 5.17, No. 4 at 5.06, or eleven minutes ahead of No. 3. Train No. 3 should have left Kingman at 4.25. It left at 4.31, six minutes late. It passed Yucca, however, at 4.55 (this is disputed, but upon what evidence we shall presently consider), it should not have passed until 4.57; and it passed Franconia six minutes ahead of time. The operator at Yucca (the only night telegraph office between Kingman and Franconia) at 4.58 or 59 reported to the train dispatcher that No. 3 had passed at 4.55.

No. 4 left Mellen, which was the only night office between Needles and Franconia, between 4.45 and 4.47, and ran 6.8 miles to Powell, arriving there at 5 o'clock. A stop was made of three or four minutes for the purpose of adjusting the flow of oil in the leading locomotive, and then proceeded towards Franconia. In the meantime No. 3 had arrived at Franconia six minutes ahead of the schedule time under the special order for leaving that station. On approaching the station the engineer signalled an inquiry for orders and received by semaphore signal from the operator the reply: "No orders from the train dispatcher." He did not stop at Franconia, and while the train was going at a speed of from sixty to seventy miles an hour, about one and one-quarter miles from Franconia it collided with No. 4, which was running from forty to fifty miles an hour. Both trains were wrecked, the engineer of the leading locomotive of No. 4 and several others were killed, and the defendant in error sustained serious injuries. The operator at Franconia had no orders that morning for either No. 3 or No. 4. But for the collision No. 4 would have reached and have been placed on the siding at Franconia, notwithstanding the delay at Powell, two or three minutes before No. 3 was due at Franconia. Plaintiff in error's rule No. 385 only requires the train not having the right of

track to take a siding and be clear of the main track before the leaving time of the opposing train. Other facts are stated in the opinion.

*Mr. Gardiner Lathrop,* with whom *Mr. T. J. Norton, Mr. E. W. Camp* and *Mr. Robert Dunlap* were on the brief, for plaintiff in error.

*Mr. W. H. Stilwell,* with whom *Mr. Byron Waters* and *Mr. Win Wylie* were on the brief, for defendant in error.

MR. JUSTICE McKENNA, after stating the case as above, delivered the opinion of the court.

The case here is in narrow compass both as to the facts and the law. It is apparent that none of the operators of train No. 4 was guilty of negligence. The second special order indicated Franconia as the meeting point of the trains and that train No. 4 should reach there before 5.17, the leaving time for train No. 3. This it could have accomplished notwithstanding the delay at Powell. It is equally apparent that train No. 3 was ahead of time and we may consider that its engineer was culpable. The question is yet presented whether the company is not charged with liability. In this question there are involved two elements, one of law and one of fact. It is not denied that the train dispatcher represented the company in the promulgation of the special orders. It is, however, asserted that this representation ceased by the promulgation of the orders and that he was not required to repeat them or promulgate new ones. "There is no ground," it is insisted, "either upon reason or authority for holding that a principal is bound to stand over his servants to enforce proper and sufficient orders once given to them." There is an instant answer to the contention. Instead of according with principle and authority it is opposed to both. It contradicts a concession elsewhere made in the argument, that it is the

duty of a railroad company to promulgate adequate rules and
regulations for the safety of employés engaged in the dangerous
duty of operating trains, and at times telegraph orders for the
movements of trains. It is the duty of a master to furnish
safe places to work in and safe instruments to work with, and
of this there need be no discussion. The duty is a continuing
one and must be exercised whenever circumstances demand
it. It may indeed often be discharged by one exercise. It
may recur at any moment in keeping moving and opposing
trains in safe relation. The rules of the company recognize
this. They require telegraph operators to report the time
of departure and passing of trains. This is absolutely nec-
essary for supervision. The business is hazardous. Trains
may be rushing towards each other upon a single track. All
may go well. The observance of time alone may be sufficient
for safety. But something may occur to one of the trains,
with or without fault of anybody, which may endanger the
other. May a train dispatcher know it and not guard against
it? A negative answer would be revolting.

There can be no doubt of the duty of the train dispatcher
in such case. His duty is clear if the circumstances call for
action. Did the circumstances in the case at bar call for
action? In answering this it will do no good to discuss cases.
The principles of law are clear. A master must furnish a safe
place for his servant to work in, and the risk the servant as-
sumes of the negligence of a fellow servant does not exempt
from that duty. Or to put the matter more guardedly, there
is no circumstance in this case which exempted from that
duty. The special orders were an assurance of the company,
through its train dispatcher, to train No. 4, that it could run
with safety between Mellen and Franconia if it arrived at the
latter station before 5.17. If anything occurred to change
that condition which came to the knowledge of the company
train No. 4 was entitled to know it, and we are brought to the
simple question, did anything occur? It is admitted all
around that train No. 3 did not comply with orders and ar-

rived and departed from Franconia ahead of time. It is disputed whether it arrived at or departed from Yucca ahead of time. Both of the lower courts found that it did, and we cannot say that the evidence does not sustain the finding. The telegraph operator at Yucca notified the train dispatcher that the train passed two minutes ahead of time—passed at 4.55; its time was 4.57; and we know that it passed Franconia six minutes ahead of time, a circumstance which tends to show that the operator at Yucca was right. That there was an error in the operator's clock was an afterthought of the train dispatcher. He received and recorded on the "train sheet" the time (4.55) which was given him. He testified (his deposition was taken by defendant in error) that he received the report of the operator at 4.58, and that he made the entry at 4.55, "just before the accident, and placed '7' over the second '5' just after the accident." He was asked no further explanation by either of the parties. The operator (who was also called by defendant in error) testified that shortly after he had reported the passing of train No. 3 he was called up by the train dispatcher, who asked: "What time have you got?" The operator gave the time 4.51 or 2, and the dispatcher replied: "Your clock is two minutes slow," or such a matter. And this testimony has corroboration in the testimony of the operator at Kingman, who heard the conversation. It appears, therefore, that the attention of the train dispatcher was challenged to the fact and felt the importance of the fact that train No. 3 was running contrary to orders. What should he have done considering that two trains were rushing toward each other upon a single track, the safety of both dependent upon the exact observance of time by both? Minutes were important, and how important the testimony exhibits everywhere. The clocks of the telegraph operators are adjusted by standard, and not allowed to vary three seconds. The practice and safety of special orders are recognized as dependent upon the exact observance of time. Their superiority to meeting points for trains is attempted to be

demonstrated by witness by saying that "it is one of the objects of good railroading to cover the greatest distance in the least time, and to keep in motion the largest number of trains on a division." The object was beset with dangers and demanded a proportionate care. It allowed little margin for inevitable delays. There was no place in it for any negligence. A train was in fault if it was behind time. It was the height of culpability to be ahead of time. A close connection at "clearance" points was expected. It was testified that trains of the first class, which No. 3 and No. 4 were, "can clear each other to a second." If the trains are of different classes the inferior must clear by at least five minutes.

Such was the system and what it demanded the train dispatcher must have known. In such a system minutes—and even seconds—are important; and it is the duty of the train dispatcher to regard them. He knew, to use the testimony of the company's chief dispatcher, that it was the duty of train No. 3 "not to run less than two hours late with reference to her schedule, as prescribed in the regular time-table." She was not allowed, was his emphatic declaration, "to make up one second of that two hours as long as that order was in effect." She (to keep up the personification of the witness) was running two minutes ahead of time. This might of itself have caused a collision. The other train was to be considered, and that minutes were important should not have been out of the train dispatcher's mind an instant. He knew that No. 3 had the right of way with no obligation to No. 4 but to observe time. He knew that No. 4 was "to get into the clear and out of No. 3's way," and had no other guide but the time prescribed.

These comments do not lose their force or application by reason of the fact that under the special orders the trains had an allowance of eleven minutes at Franconia. This allowance was made upon the basis of a strict observance of time, the perfect working of machinery and exact accordance of clocks. But such perfection in the nature of things was liable to dis-

turbance, and when disturbance was observed should have been provided against, and immediately provided against. It was no time to take chances or debate probabilities. It is to be remembered that at all stations there were not night telegraph offices. Yucca was the only one between Yucca and Franconia, and between those stations the train was lost to observation and control. The train dispatcher indeed exhibited his concern. All of the fatal significance of train No. 3 running ahead of time came to his mind. His mistake was to account for it by an error in the telegraph operator's clock (giving to him this excuse against the finding of the lower courts), although he knew that the clock must have been adjusted that day under the rules with the standard time. If we were forced to find the fact we should find it against him, but it is enough to say that there was brought to him, considering his position and the responsibilities upon him, a demand for a care which he omitted to observe. If he had been as considerate as he ought to have been he would have stopped No. 3 at Franconia. And for this conclusion we need not the proof afforded by the collison. The collision, however, and the excuses offered for it, make the conclusion irresistible. Plaintiff in error excuses the train dispatcher by a defect in the clock of the telegraph operator at Yucca. The engineer of No. 3 excuses himself by virtually condemning the clocks of the company by which he had tested his watch. He is sure if No. 4 had been running on time he would have met her at Haviland, the station between Yucca and Franconia. A system which permits such confusion and the endangering or human lives is wrong or wrongly administered. We need go no farther in the present case than to say that it was wrongly administered. The train dispatcher failed to take into account and do what a prudent man would have taken into account and have done.

*Judgment affirmed.*

Mr. Justice Brewer dissents.