JOHN H. RICKER, DEFENDANT IN ERROR, v. THE CEN-
TRAL RAILROAD COMPANY OF NEW JERSEY, PLAINT-
IFF IN ERROR.

Argued March 12, 1906—Decided November 19, 1906.

A train despatcher of a railroad company, whose duty is to issue
    telegraphic orders for the movement of trains upon a single-track
    road in the name of the superintendent and to see that they are
    transmitted, is not a fellow-servant of a fireman upon one of the
    locomotives of the company.

On error to the Supreme Court.

For the defendant in error, *Louis H. Schenck.*

For the plaintiff in error, *William D. Edwards* and *George
Holmes.*

The opinion of the court was delivered by

SWAYZE, J. The plaintiff, a fireman on train No. 30, south
bound, on a branch of the defendant railroad, was injured
in a collision with train No. 31, north bound, one mile south
of Hoffman's station. The trial judge allowed the case to
go to the jury only upon the question of negligence on the
part of the train despatcher at High Bridge, the junction
point of the branch road with the main line. Two questions
are therefore presented on this writ of error:

*First.* Was the negligence of the train despatcher the neg-
ligence of the company, so as to preclude the application of
the rule that denies recovery for injuries caused by the negli-
gence of a fellow-servant?

*Second.* If so, was there evidence of negligence sufficient
to justify the submission of the case to the jury?

The general principle, well established in the cases, is that
the master is bound to take reasonable care that the place
where the workmen are engaged shall be kept safe (*Belleville*

*Stone Co.* v. *Mooney,* 32 *Vroom* 253), and if the master selects an agent to perform this duty for him, and the agent fails to exercise reasonable care and skill in its performance, the master is responsible for the fault. *Steamship Company* v. *Ingebregsten,* 28 *Id.* 400.

The master is held liable in a proper case because the negligence is regarded by the law as his negligence. Where the negligence consists merely in the failure of the agent to perform a duty properly entrusted to him by the master, the master cannot be held liable by virtue of the rule *respondeat superior,* for the application of that rule is prevented by the well-established exception which exempts the master from liability to a servant for injuries resulting from the negligence of a fellow-servant.

In applying the general principles to the facts of a particular case, it often becomes difficult to determine whether the negligence in question is to be regarded as the negligence of the master or of the servant alone, and various tests to determine this question have been suggested. In this state we have rejected the theory which holds the master liable merely because the negligent servant is in charge of a separate department or is superior in rank to the one injured. *Knutter* v. *Telephone Company,* 38 *Vroom* 646.

In *Baltimore and Ohio Railroad Co.* v. *Baugh,* 149 *U. S.* 368, it was said that the question turns rather on the character of the act than on the relation of the employes to each other.

This test had already been adopted in our Supreme Court. *Smith* v. *Oxford Iron Co.,* 13 *Vroom* 467, 474, where Justice Van Syckel said that the neglect to perform those duties which devolve upon the company should be regarded as the neglect of the company itself, and was adopted by this court in *Smith* v. *Erie Railroad Co.,* 38 *Id.* 636.

In Steamship Company *v.* Ingebregsten, Justice Dixon said, with reference to the inspection and repair of apparatus, that a rational distinction would seem to be that when the employe's duty to inspect and repair is incidental to his duty to use the apparatus in the common employment, then he is not en-

trusted with the master's duty to his fellow-servant, and the master is not responsible to his fellow-servant for his fault, but that if the master has cast a duty of inspection or repair upon an employe who is not engaged in using the apparatus in a common employment with his fellow-servant, then that employe in that duty represents the master, and the master is chargeable with his default. Both of these tests—the character of the act and its incidental feature—are useful tests, but there is nothing in the cases cited to indicate that there may not be other tests also. The question to be determined is whether, under all the circumstances of the particular case, the servant is to be regarded as the *alter ego* of the master. It may be that the master has entrusted him with such control over the general conduct of the business that he must be regarded as standing in the master's shoes. This is especially likely to be the case with a corporation which can act only through agents, as was suggested in *Smith* v. *Oxford Iron Co.,* 13 *Vroom* 467, and in *O'Brien* v. *American Dredging Co.,* 24 *Id.* 291. In such cases the liability of the master depends upon whether he has entrusted the servant with such control as is properly the business of the master.

We think the facts in the present case necessitate an inference that the train despatcher was the *alter ego* of the defendant. It will hardly be denied that the duty of a railroad company to take care that the place in which its employes are to work shall be reasonably safe requires the company to prepare a schedule or time-table for the running of its trains. Such a schedule is absolutely essential in order that the system adopted by the company for the conduct of its business may be reasonably safe. When that schedule breaks down, it may be under such circumstances that a new schedule to meet the emergency can be made by the train hands themselves, as, for instance, when a train is delayed and the engineer makes up time by running faster than his ordinary schedule. But when the railroad is a single track, and it becomes necessary for the company to require information to be given to a central authority, who is empowered to direct

the movement of all trains, his orders for that purpose amount to a new emergency schedule. We agree with the Court of Appeals in New York that the preparation of that schedule is a positive duty of the master. *Hankins* v. *New York, Lake Erie and Western Railroad,* 142 *N. Y.* 416; 37 *N. E. Rep.* 438.

The work is not merely incidental, as was the duty of the brakeman to signal the oncoming train, in *Miller* v. *Central Railroad Co.,* 40 *Vroom* 413. What chiefly distinguishes the train despatcher's work in the present case is that by the company's rule it was made his duty to issue telegraphic orders for the movements of trains in the name of the superintendent, and to see that they were transmitted and recorded in the manner prescribed. This duty, in the present case, required him to issue orders to three different trains, miles apart, and might sometimes require orders to many trains scattered along the company's whole line. Such work as that pertains to the master, the natural directing head. The train despatcher is not merely a superior servant, like .the foreman of a **gang** of workmen.

If it be conceded, as we think it must be, that the duty to prepare a time-table is the company's duty, the duty is not discharged by preparing a time-table once for all, accompanied by rules regulating variations therefrom. The duty to exercise reasonable care is continuous, and the need of a time-table to direct the movement of trains is constant. Upon the question whether this duty is a positive one resting on the master, we can see no distinction between this case and the case of *Smith* v. *Erie Railroad Co.,* 38 *Vroom* 636. It is quite as much the master's duty to keep the time-table up to date as to keep the roadbed in repair. Both are equally essential to the servant's safety.

The courts of fourteen of our sister states, and the federal courts, including courts which rest the liability of the master upon the same ground as our own cases, have reached the same result. The cases have been recently diligently collected by Mr. Justice Chase, of New Hampshire, in *Wallace* v. *Boston and Maine Railroad Co.,* 72 *N. H.* 504. It would

serve no useful purpose to repeat the citations. To them may be added the recent case of *Santa Fe Pacific Railroad Co.* v. *Holmes,* 202 *U. S.* 438. The courts of Maryland and Mississippi seem to stand alone in the other view, and their reasoning does not commend itself to us.

We do not rest our view upon the fact that the train despatcher is superior in rank to the fireman of a locomotive. We can conceive of cases where the company would not be responsible for his negligence. Perhaps *Reiser* v. *Pennsylvania Railroad Co.,* 152 *Pa. St.* 38, may be regarded as such a case. There it was held that the knowledge of the train despatcher that a station agent and telegraph operator, whose negligence caused the accident, was incompetent, did not make the company liable. We rest the defendant's liability in this case upon the character of the work of the train despatcher in regulating the movement of trains.

In order to determine whether there was sufficient evidence to justify a submission of the case to the jury, a rather full statement of the facts proved is necessary. Three trains are involved. No. 30 and No. 52 were southbound trains, and by the rules of the company had the right of way. No. 31 was a northbound train. According to the time-table, No. 52 should have reached the terminus at High Bridge at nine-forty A. M., ten minutes before the departure of No. 31, and No. 30 and No. 31 should have met at Hoffman's, three and nine-tenths miles north of High Bridge. On the morning of the collision No. 52 was detained and considerably behind time. At nine-forty-three A. M., three minutes after No. 52 was due at High Bridge, the train despatcher issued an order directing Nos. 52 and 31 to meet at Hoffman's. This order reached the telegraph operator at Califon, a mile and a half north of Hoffman's, and he put out a signal to stop the southbound train. In the meantime, No. 30 had passed No. 52, which was on a switch at Vernoy, a little more than a mile north of Califon. By the rules of the company a train overtaking another train of the same or superior class, disabled so that it cannot move, will run around it, assuming the

rights and taking the orders of the disabled train to the next telegraph office which is open, where it will report to the superintendent. The next telegraph office after No. 30 had passed No. 52 was Califon. At that point train No. 30 offered to stop, but the station agent and telegraph operator signaled to go ahead, and gave the train conductor a clearance card, which reads as follows: "I have no orders for your train. Signal is out for 52." It was then about ten-twenty A. M. No. 30 was due at Califon at ten-one, and being a southbound train had the right of way.

At nine-forty-three, the conductor of No. 31, then waiting at High Bridge, received the order directing him to meet No. 52 at Hoffman's. At that time, according to the time-table, No. 30 should have been fifteen minutes north of Vernoy. The conductor of No. 31 asked the train despatcher if No. 30 was ahead of No. 52, and was assured that it was not. When No. 31 was ready to leave High Bridge the conductor saw the order board red, which meant there were orders for him, and he started to the office to see what the trouble was, but as he got in sight of the office the yardmaster. and the train despatcher both gave him the regular hand signal—the regular day signal—to go ahead, and he started with his train at ten-fifteen or ten-sixteen. The road was a single track, and the result was a head-on collision one mile south of Califon, at ten-twenty-eight. The train despatcher had been inquiring about No. 52 of the telegraph operator at Califon for half or three-quarters of an hour prior to the arrival of No. 30 at Califon, but is not shown to have, made any inquiry as to No. 30. Under these circumstances, we think it was a question for the jury whether the train despatcher was negligent in allowing the time from nine-forty-three to ten-fifteen to elapse without any further orders, although he must be presumed to know, from the time-table, that No. 30 was due at Hoffman's at ten-ten, five minutes before he ordered No. 31 out of High Bridge, and might have passed No. 52, which was then at least fifty minutes behind time, for it was due at Califon at nine-twenty-five. It is true the witnesses testified that No. 30 had no right to pass No. 52 at Vernoy,

but they also said it frequently did pass. No. 30 was due at Califon at ten-one.

We think it was a question for the jury whether the care necessary in directing the movements of trains upon a single-track road did not require new orders; the order of nine-forty-three A. M. was adapted to the conditions existing at the time, but not to the condition thirty-two minutes later. At the time No. 31 was ordered out of High Bridge it did not have full.schedule time to make the meeting point at Hoffman's, and could not leave without special orders. The fact that a special order was necessary would naturally suggest to the train despatcher that the operator at Califon be notified that such order had been given to No. 31. To make a special order accomplish its purpose, it seems reasonable that it should be communicated to all trains likely to be affected, and not to one alone. Such was the course adopted' with the order of nine-forty-three A. M. If the same course had been adopted with the order given No. 31 at ten-fifteen, the accident might have been averted, for four or five minutes elapsed before No. 30 left Califon, a time long enough to enable notice to be sent to the operator at Califon. We think it was also a fair question whether the train despatcher was not negligent in ordering No. 31 to leave High Bridge' at a time when No. 30, by the time-table, ought to have passed Hoffman's, without making inquiry as to the whereabouts of No. 30, especially as No. 30 had the right of way. It may be said that the operator at Califon ought to have known that the order as to No. 52 was applicable to No. 30, since the latter had passed No. 52, and ought to have reported No. 30's arrival before giving the clearance card. We incline to think he ought to have done so. It may also be said that the conductor of No. 30, before acting upon the clearance card, should have waited for the operator at Califon to report his arrival and receive further orders, although it is to be said in his defence that he may well have thought that such a report had been made, for his train could be seen for three or four hundred yards before it reached Califon and was running so slowly that the operator had time to make the clear-

ance card after he saw the train coming. But even if the operator at Califon and the conductor of No. 30 were negligent, the question would still remain whether, under all the circumstances of the case, the train despatcher exercised reasonable care in depending upon their accepting an order issued for No. 52 thirty-two minutes before as an order still obligatory on No. 30. Ought it not to have occurred to him that they might possibly think, as they probably did think, that the order to No. 52 did not apply to No. 30, and that No. 31 would be held at High Bridge until No. 30 reached that point, especially as the train dispatcher, up to ten-fifteen, is not shown to have made any inquiry as to No. 30, although her regular time for leaving Califon had passed?

If the accident was caused by the negligence of the operator at Califon and of the conductor of train No. 30 co-operating with the negligence of the train despatcher, the defendant is nevertheless liable. *Cole* v. *Warren Manufacturing Co.,* 34 *Vroom* 626; *Flanigan* v. *Guggenheim Smelting Co., Id.* 647; *Campbell* v. *Gillespie Co.,* 40 *Id.* 279.

We find no error, and the judgment must be affirmed.

GARRISON, J. (dissenting). My vote for reversal is on the ground that there was no testimony of any negligence on the part of the company's agent at High Bridge.

*For affirmance*—THE CHANCELLOR, FORT, GARRETSON, SWAYZE, BOGERT, VREDENBURGH, VROOM, GREEN. 8.

*For reversal*—THE CHIEF JUSTICE, GARRISON, HENDRICKSON, PITNEY, REED, GRAY, DILL. 7.