## WASHINGTON RAILWAY COMPANY *v.* DOWNEY.

---

MASTER AND SERVANT; STREET RAILWAYS; EMPLOYERS' LIABILITY ACT; NEGLIGENCE; CONTRIBUTORY NEGLIGENCE; EVIDENCE; QUESTIONS FOR JURY; TRIAL; INSTRUCTIONS TO JURY; APPEAL AND ERROR.

1. The application of the employers' liability act of Congress of June 11th, 1906 (34 Stat. at L. 232, chap. 3073, U. S. Comp. Stat. Supp. 1911,

p. 1316), to common carriers within the District of Columbia, whose lines extend beyond the District, that is, who are also interstate carriers, does not render the act unconstitutional. (Following *Hyde* v. *Southern R. Co.* 31 App. D. C. 466.)

2. A railway corporation, although merely a carrier of passengers, is a common carrier within the meaning of the employers' liability act of Congress.

3. An order directing trains to come to a full stop before crossing the draw in a bridge is designed for the protection of employees as well as passengers, and is admissible in evidence in an action by an employee to recover damages for personal injuries sustained at a time when the train failed to make the prescribed stop.

4. Whether the excessive rate of speed at which a train entered upon the draw in a bridge without first making a stop before reaching a point where there was a break in the rails and wire was the cause of the injury sustained by a trolleyman, who was thrown between the cars when the trolley flew off, and, if so, whether he was exercising due care, or, if not, whether his negligence was gross or slight, are questions for the jury in an action under the employers' liability act, upon evidence showing that the trolley would not have jumped had the train been running at a reasonable speed, and that running trains at an excessive speed was in violation of orders and regulations of the company, notwithstanding that it was the duty of the trolleyman to prevent the jumping of the trolley pole, since he was entitled, in the performance of his duties, to the assistance and protection of the regulations of the carrier which require trains to stop before crossing the draw, and then to proceed slowly.

5. The reception of evidence, admissible when received, but rendered no longer pertinent by a subsequent ruling of the court, is not available error, where no motion was made to strike it out, and no charge was requested concerning it.

6. The refusal of a requested instruction not in harmony with the facts of the case is not erroneous.

7. When counsel, not content with a fair charge, resort to requests of exact nicety, they must abide to be judged by that same standard.

8. A writ of error from the Supreme Court of the United States to this court, sought on the ground that the proper construction of an act of Congress has been drawn in question, will be denied, where the question raised has been determined by a decision of that court.

No. 2467. Submitted February 3, 1913. Decided March 6, 1913

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action to recover damages for personal injuries.

*Affirmed.*


The Court in the opinion stated the facts as follows:


Appeal from a judgment of the supreme court of the District in a suit against the appellant, the Washington, Alexandria, & Mt. Vernon Railway Company, for personal injuries sustained by the appellee, Edward A. Downey, while acting as a trolleyman on appellant's cars within the District of Columbia, November 29, 1907.

The evidence of the plaintiff tended to show that the defendant operates an electric railway and is a common carrier of passengers and freight within the District of Columbia, its double line of tracks extending across the highway bridge spanning the Potomac river, and thence through Alexandria to Mt. Vernon, Virginia. Electric power is communicated to the motor cars in Virginia and upon said highway bridge by a wire strung over the center of the track, the connection with the cars being made by the ordinary trolley pole. One end of this pole is attached to the top of the car, and a stiff spring tends to cause it to assume a perpendicular position. A rope is attached to the upper end of the pole, and this is held by the trolleyman, who sees to it that the little wheel at the upper end of the trolley pole is brought in contact with the overhead wire. The trolley pole then assumes an angle probably of about 45 degrees. At the time of the accident the defendant ran a train of two cars, and it was the duty of the trolleyman to stand between the two, either on the rear platform of the motor car or on the front platform of the trailer. His duties were to call stations, attend to passengers getting on or off, and to attend to the trolley. When not attending to passengers it was his duty constantly to hold the trolley rope. This was to prevent the trolley pole from jumping the wire, and also to enable the trolleyman to respond to the orders of the motorman

or conductor. There is a draw in said bridge, which, of course, necessitates a break in the trolley wire at either end of the draw. This draw leaves a space of about 4 inches, and to aid in guiding the trolley wheel a metal plate is arranged in some way at the point of the break. About 300 feet from the draw there was suspended over the track a "Stop" sign, and the following general order of the defendant was in force at the time of the accident: "Before crossing the draw, trains must come to a full stop at point indicated by a red board on which is the word 'stop.'" Trolleymen were instructed in accordance with this order. After cars had come to rest at the stop sign it was the trolleyman's duty to give the motorman a signal. The cars then proceeded slowly and the current was supposed to be shut off just before the draw was reached. It was then the trolleyman's duty to pull down the trolley pole. If the train was proceeding more than 6 miles an hour (some of the witnesses put it even less), the trolley pole wheel would not pass over the break at the draw; in other words, the trolley pole would jump. There was also evidence tending to show that at the time of the accident it was a rule of the company to reduce the speed of a train to 6 miles an hour across the draw. Another rule of the company held conductors and motormen to equal responsibility for violation of the rule of the company governing the safety of trains, and requiring them to "take every precaution for the protection of their train, even if not provided for by the rules." Another rule required the trolleyman, when with the motor, to "obey the orders of the motorman respecting the proper performance of his duties."

The accident occurred between 10:30 and 11 o'clock on the night of November 29, 1907. "It was drizzling snowlike, and the snow would come down and strike you in the face like mist or rain; that after he got on the bridge he got himself in position to wait until he made the stop; and that the train went past this draw and the trolley flew off and threw him down between the cars; that he had hold of the rope; had the rope in his hand; that the train did not make any stop at all; did not slow down any; that he was waiting for it to stop; that the

train was going so fast and the spans passed him so quick he did not have any idea that they were approaching the draw."

At the close of plaintiff's evidence the defendant moved for an instructed verdict, and the motion was repeated at the close of all the evidence, the principal grounds of the motion being the nonapplicability of the employers' liability law of 1906, and that the alleged negligence of the defendant was not the proximate cause of the accident.

*Mr. John S. Barbour, Mr. D. S. Mackall,* and *Mr. B. D. Boteler* for the appellant.

*Mr. Edmund Burke* and *Mr. Leo P. Harlow* for the appellee.

Mr. Justice Robb delivered the opinion of the Court:

(1) The suggestion that said act of 1906 (34 Stat. at L. 232, chap. 3073, U. S. Comp. Stat. Supp. 1911, p. 1316) is unconstitutional if it shall be held to apply to common carriers within the District of Columbia whose lines extend beyond the District, that is, who are also interstate carriers, is met by the decision of this court in *Hyde* v. *Southern R. Co.* 31 App. D. C. 466, and in *El Paso & N. E. R. Co.* v. *Gutierrez,* 215 U. S. 87, 54 L. ed. 106, 30 Sup. Ct. Rep. 21. In each of those cases the common carrier was also an interstate carrier, and the act in question was held constitutional so far as it applied to commerce within the District of Columbia and the territories. In this act Congress supposed it was also legislating with respect to carriers engaged in interstate commerce. This attempt having been declared to be abortive (*Employers Liability Cases* [*Howard* v. *Illinois C. R. Co.*] 207 U. S. 463, 52 L. ed. 297, 28 Sup. Ct. Rep. 141), the act of April 22, 1908 (35 Stat. at L. 65, chap. 149, U. S. Comp. Supp. 1911, p. 1322), was passed. This act deals with both classes of carriers and was declared constitutional in *Second Employers' Liability Cases* (*Mondou* v. *New York, N. H. & H. R. Co.*) 223 U. S. 1, 56 L.

ed. 327, 38 L.R.A.(N.S.) 44, 32 Sup. Ct. Rep. 169, 1 N. C. C.
A. 875.

(2) Assuming the validity of the act, it is insisted that it
does not apply to the defendant, because it is merely a carrier of
passengers; the contention being that a carrier of passengers is
not a common carrier within the meaning of said act. We might
rest our decision upon the uncontradicted testimony in this case
that the defendant is both a carrier of passengers and of freight;
but, even though it be assumed to be merely a carrier of pas-
sengers, the result is the same, for, as was observed by the court
in the *Employers' Liability Cases (Howard v. Illinois C. R.
Co.)* 207 U. S. 497, 52 L. ed. 308, 28 Sup. Ct. Rep. 141, it is
apparent from the 1st section of the act that it was intended to
include every individual or corporation who might engage in
interstate commerce as a common carrier. "Its all-embracing
words leave no room for any other conclusion. It may include,
for example, steam railroads, telegraph lines, telephone lines,
the express business, vessels of every kind, whether steam or
sail * * * carriages, *trolley lines,*" etc. In defining com-
merce in the *Second Employers' Liability Cases,* the court said:
"The term 'commerce' comprehends more than the mere inter-
change of goods. It embraces commercial intercourse in all its
branches, including transportation of passengers and property
by common carriers, whether carried on by water or by land."
See also, *Omaha & C. B. St. R. Co. v. Interstate Commerce
Commission,* 191 Fed. 40.

(3) It is specified as error that the court admitted in evi-
dence said "Stop" order, the contention being that this was for
the safety of passengers, and not for the protection of employ-
ees. It is difficult to perceive upon what reasonable theory it
can be contended that this order was. not for the protection of
both passengers and· employees. Both being upon the car, they
were in identically the same situation, and in promulgating this
and other orders looking to the safety of its passengers and em-
ployees the company was doing no more ·than the law required.
*Northern P. R. Co. v. Peterson,* 162 U. S. 346, 353; 40 L. ed.
994, 997, 16 Sup. Ct. Rep. 843; *Santa Fe P. R. Co. v.· Holmes,*

202 U. S. 438, 441, 50 L. ed. 1094, 1095, 26 Sup. Ct. Rep. 676, 20 Am. Neg. Rep. 237. In the latter case it was said: "It is the duty of a railroad company to promulgate adequate rules and regulations for the safety of employees engaged in the dangerous duty of operating trains."

(4) We agree with the trial court that, under all the evidence, it was for the jury to say whether, if they believed that the train was being run at an excessive rate of speed when it entered upon the draw, such excessive speed was the cause of the accident. The evidence showed conclusively that the trolley would not have jumped at this point had the train been run at a reasonable rate of speed, and there was evidence that the running of the train at an excessive rate of speed was in direct violation of the orders of the defendant and the general instructions of its employees. But it is urged that the duty of the trolleyman required him to prevent the very thing that occurred; namely, the jumping of the trolley pole. We think it a sufficient answer to this contention to suggest that while it was the duty of the trolleyman to use all reasonable diligence in preventing such an occurrence, he was entitled, in the performance of his duties in this regard, to the assistance and protection of the regulations of the defendant. The jumping of the pole at some point where there was no break in the wire— an unexpected and perhaps unexplainable occurrence—might or might not have been attended with danger to him. The jumping of the pole at this particular point, where, of course, there was a break in the rails as well as in the wire, might have resulted much more seriously. There would, of necessity, be a jar of the train itself, and a break in the trolley wire and the presence of the metal plate might have produced much greater friction and shock than would have been present at some other point where there was neither a break in the wire nor in the rails. That these suggestions are not fanciful is clearly apparent from the testimony that one of the purposes of the stop before reaching the draw was to appraise the trolleyman of its proximity, that he might pull down his trolley pole before entering upon it. And in determining whether the plaintiff was exercising due care at the

time of the accident, or, if not, whether his negligence was gross or slight, it was competent and proper for the jury to take into consideration all the circumstances disclosed by the evidence.

(5) There was evidence tending to show that the motorman upon the train in question was reputed to be a reckless or fast runner, and that this had been brought to the knowledge of the company. The admission of this evidence is assigned as error. In the second count of the declaration it is averred that this motorman had been in the defendant's employ for a long time, and that he was "negligent, unskilful, unfit, incompetent, and reckless as a motorman of cars, of which facts the defendant had notice and knowledge, and by the use of ordinary diligence" would have had such knowledge; and that notwithstanding such knowledge or means of knowledge on the part of the defendant, it retained him in its employ and intrusted to him the control of its cars. It is apparent, therefore, that had the court, as requested by the defendant, ruled that the employers' liability act was not applicable, evidence of the incompetency of said motorman, if brought home to the company, would have been very material. Hence it was clearly admissible when offered. As no motion was subsequently made to strike out the evidence, and no charge requested concerning it, its pertinency at the time the case was submitted to the jury was not passed upon by the trial court, and there is therefore no foundation here for this assignment of error. Moreover, it is apparent from the prayers offered by the respective parties and the charge of the trial court, that this evidence was lost sight of when the liability act was held applicable. The question then was not whether the motorman had theretofore been negligent, but whether he was negligent at the time of the accident.

(6) It is further assigned as error that the court refused to instruct the jury, as requested by the defendant, that if they should find a negligent failure to stop the cars at the "Stop" sign, before running onto the draw, as required by said stop order, and that said order "was adopted for the protection of the *passengers* and *property* of the defendant company from the

dangers of an open draw, and that it was also negligent in running its car on said bridge at an unusual rate of speed, and that the plaintiff knew these facts, or either of them, or, in the exercise of due care, should have known them, or either of them, and could with such knowledge, by the exercise of due care and the means within his power, have avoided the injury by pulling down his trolley pole, or by giving the motorman a signal to stop, or otherwise, then it was his duty to do so without waiting for a stop or signals from the motorman, and his failure to do so would be gross negligence, and if it resulted in his injury, would be the proximate cause thereof." This prayer is objectionable. It presupposes that the stop order was for the sole protection of passengers and property, while the testimony, as we have seen, was that one of the purposes of the stop at the stop sign was to enable the trolleyman to prepare to enter upon the draw. There was also evidence that the trolleyman was charged with no responsibility or control of the cars, and that had he attempted to exercise such responsibility or control it would have been the conductor's duty to have reported him to the company. All this, as previously suggested, had a distinct bearing upon the question whether he was in the exercise of due care at the time of the accident, and, if not in the exercise of due care, whether his negligence was slight or gross. "When counsel, not content with a fair charge resort to requests of exact nicety, they must abide to be judged by that same standard." *Schmidt* v. *Vanderveer,* 110 App. Div. 758, 97 N. Y. Supp. 441. The observation of the court in that case is applicable here. The trial court in the present case instructed the jury upon the question of contributory negligence; and if counsel desired further instruction upon that point, the prayer submitted should have been in harmony with the facts of the case.

This disposes of all the material assignments. Finding no error, we affirm the judgment, with costs, and it is so ordered.

*Affirmed.*

An application by the appellant for the allowance of a writ of error to remove the cause to the Supreme Court for review was

denied March 20, 1913, Mr. Justice ROBB delivering the opinion of the Court:

The cause of action arose in the District of Columbia. Appellant, a common carrier in the District, and also between the District and the State of Virginia, raised the question of the applicability of the employers' liability act of June 11, 1906, the contention being that the act, to be constitutional, could apply only to local carriers, and not to carriers doing both a local and interstate business. The ruling of the trial court was adverse to appellant, and that ruling was sustained in this court. A writ of error to the Supreme Court of the United States is now sought on the ground that the proper construction of said act has been drawn in question.

In *El Paso & N. E. R. Co.* v. *Gutierrez,* 215 U. S. 87, 54 L. ed. 106, 30 Sup. Ct. Rep. 21, the validity of said act of 1906 was upheld so far as it related to the District of Columbia and the territories. A reading of that decision discloses, we think, that its necessary effect was to include within the scope of said act "every common carrier engaged in trade or commerce in the District of Columbia." Since the question raised by appellant was no longer an open one, the application for writ of error must be denied.                                        *Writ denied.*

On April 3, 1913, the Supreme Court of the United States granted the writ of error.