SANDIDGE v. ATCHISON, T. & S. F. RY. CO.

(Circuit Court of Appeals, Ninth Circuit. February 19, 1912.)

No. 1,952.

1. MASTER AND SERVANT (§ 90*)—INJURIES TO SERVANT—CARE REQUIRED.

It is the duty of a master to adopt all reasonable means and precautions to provide for the safety of his employés while they are engaged in his employment; the degree of care being measured by the dangers to be apprehended or avoided.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 90.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. MASTER AND SERVANT (§ 90*)—DUTY OF MASTER—DANGERS.

It is the duty of a master not o expose his employés to perils or hazards against which they may be guarded by proper diligence of the master.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 139; Dec. Dig. § 90.*]

3. MASTER AND SERVANT (§ 90*)—INJURIES TO SERVANT—"REASONABLE DILIGENCE."

Reasonable diligence of a master to guard against injuries to employés implies such watchfulness, caution, and foresight as, under all the circumstances of the particular service, a master ought to exercise.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 139; Dec. Dig. § 90.*

For other definitions, see Words and Phrases, vol. 7, pp. 5957, 5958.]

4. MASTER AND SERVANT (§ 90*)—INJURIES TO SERVANT—"NEGLIGENCE."

Failure of a master to exercise such reasonable diligence, caution, and foresight as a prudent man would exercise under similar circumstances to guard employés against injuries is negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 139; Dec. Dig. § 90.*

For other definitions, see Words and Phrases, vol. 5, pp. 4743–4763; vol. 8, pp. 7729–7731.]

5. MASTER AND SERVANT (§ 185*)—INJURIES TO SERVANT—VICE PRINCIPAL.

Where a railroad train dispatcher, on being informed of a loaded runaway car on which decedent was riding, in an endeavor to stop the same, directed an intermediate telegraph operator to line certain switches so as to turn the car onto a branch line, where the car was derailed and wrecked, the dispatcher in giving such orders was a vice principal.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 385–421; Dec. Dig. § 185.*]

6. MASTER AND SERVANT (§ 226*)—INJURIES TO SERVANT—ASSUMED RISK.

The risk assumed by an employé in carrying on his master's business does not exempt the master from performance of his nondelegable duty to furnish a safe place for his employé to work.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 659–667; Dec. Dig. § 226.*

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

7. TRIAL (§ 165*)—QUESTIONS OF LAW OR FACT—DIRECTION OF VERDICT—CONSIDERATION OF EVIDENCE.

On defendant's motion for a nonsuit at the close of plaintiff's case, plaintiff is entitled to have the evidence, with all the inferences properly deducible therefrom, considered in the light most favorable to her cause of action.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 373, 374; Dec. Dig. § 165.*]

8. MASTER AND SERVANT (§ 286*)—DEATH OF SERVANT—NEGLIGENCE OF TRAIN DISPATCHER—QUESTION FOR JURY.

In an action for death of a railroad conductor by the wrecking of a runaway car, whether defendant's train dispatcher was negligent in giving orders to turn the car, which was heavily loaded and running at a high rate of speed, onto a branch line track equipped with light rails, where the car was immediately derailed and wrecked, was for the jury.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 286.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**9.** MASTER AND SERVANT (§ 129*)—DEATH OF SERVANT—NEGLIGENCE OF VICE PRINCIPAL—CONTRIBUTING CAUSE.

It was not necessary that the negligence of a railroad train dispatcher should have been the sole cause of decedent's death by the derailment of a car which the dispatcher ordered turned onto a branch line in order to establish actionable negligence on the part of the railroad company. provided the train dispatcher's negligence contributed to or had a share in bringing about the accident.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 257–263; Dec. Dig. § 129.*]

**10.** MASTER AND SERVANT (§ 289*)—DEATH OF SERVANT—RAILROADS—RULES.

Where decedent, a freight conductor, was killed while riding a runaway car, he was not negligent as a matter of law in violating the rule prohibiting trainmen from taking a car out on the main line, unless they are certain that the brake is in order; it appearing that the brake on the car in question was insufficient to hold it only because it was overloaded.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089–1132; Dec. Dig. § 289.*]

**11.** MASTER AND SERVANT (§ 289*)—DEATH OF SERVANT—RAILROADS—RUNAWAY CARS—NEGLIGENCE—QUESTION FOR JURY.

Where a freight conductor was killed while riding a runaway car which had a brake which was insufficient because the car was overloaded, whether he was negligent in permitting the car to be placed on the main track in charge of a brakeman, in alleged violation of a rule prohibiting trainmen from taking a car on the main line on the grade and cutting it off and leaving it alone, was for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089–1152; Dec. Dig. § 289.*]

**12.** MASTER AND SERVANT (§ 258*)—DEATH OF SERVANT—RUNAWAY CAR—COMPLAINT.

Where, in an action for death of a railroad freight conductor while riding a runaway car, which was alleged to have been negligently switched onto a branch line, where it was derailed because of the lightness of the rails, the complaint charged that at the time the car was so switched the brakes were out of repair and insufficient to hold the car, and that the accident occurred by reason of the negligence of the defendant, its servants and employés as previously alleged, the complaint sufficiently charged negligence with reference to the sufficiency of the brake.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 816–836; Dec. Dig. § 258.*]

**13.** MASTER AND SERVANT (§ 248*)—DEATH OF SERVANT—SERVANT'S NEGLIGENCE—LAST CLEAR CHANCE.

Though decedent, a freight conductor, who was killed while riding a runaway car, was negligent in setting the car out on the main track on an ascending grade without knowing that the brake was sufficient to hold it, such negligence would not preclude a recovery for his death under the last clear chance doctrine where defendant, having sufficient knowledge of decedent's danger and notice to put a reasonably prudent man on the alert, was negligent in failing to take proper precautions to stop the car in such a manner as not to cause injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 801–804; Dec. Dig. § 248.*]

**14.** MASTER AND SERVANT (§ 289*)—DEATH OF SERVANT—EMPLOYER'S LIABILITY ACT.

Under the employer's liability act (Act Cong. April 22, 1908, c. 149; 35 Stat. 65 [U. S. Comp. St. Supp. 1909, p. 1171]), providing that the fact that an employé has been guilty of contributory negligence shall not

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employé, where decedent, a freight conductor, was killed while engaged in interstate commerce in the operation of an interstate train by the escape of an overloaded freight car, the defense of contributory negligence was for the jury.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 289.*]

15. MASTER AND SERVANT (§ 288*)—DEATH OF SERVANT—RAILROADS—ASSUMED RISK.

Where a railroad freight conductor. seeing that an overloaded freight car on the main track in charge of a brakeman had escaped from his control, caught the car and went to the brakeman's assistance, and was thereafter killed by derailment of the car, the duty he assumed was incident to his position as conductor of the train, and one which he was not at liberty to abandon, unless the danger was so obvious that an ordinarily prudent person would not have incurred the same, and hence he did not assume the risk as a matter of law.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 288.*]

16. MASTER AND SERVANT (§ 226*)—DEATH OF SERVANT—ASSUMED RISK.

. Under the rule that an employé assumes the risk of dangers incident to the employment, but not those arising from the employer's negligence, the defense of assumed risk is not available to an employer who has himself been negligent with respect to such employment.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 659–667; Dec. Dig. § 226.*]

` In Error to the Circuit Court of the United States for the Southern District of California.

Action by Christina A. Sandidge, as administratrix of the estate of William W. Sandidge, deceased, against the Atchison, Topeka & Santa Fé Railway Company, to recover for the alleged wrongful death of her intestate. Judgment for defendant, and plaintiff brings error. Reversed, and new trial granted.

The death of plaintiff's intestate, who was employed by defendant as conductor of a freight train, occurred in Arizona on May 3, 1909, as the result of the alleged negligence of the defendant in the derailment of a box car on which decedent was riding. The action was commenced in the· Circuit Court of the United States for the Southern District of California on February 4, 1910. ·

It is alleged in the complaint that defendant was engaged in commerce as a common carrier by railroad between the state of California and the state of Missouri; that the deceased was in the employ of the defendant as a conductor of a freight train operated by. the defendant between the states of California and Missouri, and in the territory of Arizona. It is alleged that the accident occurred while the decedent in the discharge of his duties as conductor of a freight train was attempting to assist the brakeman in stopping a loaded car which said brakeman was unable to control by reason of the heavy load and the defective condition of the brakes. It is further alleged that a train dispatcher, who was an employé of the defendant, carelessly and negligently instructed another employé of the defendant to switch said car from said main track on which it was moving onto another railroad line, the rails of which were in such condition that, when the said car was so switched, it jumped the track, and was completely wrecked and demolished, and plaintiff's intestate killed.

The answer denied any negligence on the part of the defendant, and set forth, further, that any injury suffered by decedent was caused by his negligence, which was the sole and proximate cause thereof. No defense of assumption of risk by decedent appears in the answer.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The evidence introduced by the plaintiff in error tended to show that the decedent had been at work in the railroad yard at Kingman, Ariz., making up his train preparatory to proceeding in an easterly direction; that, when he had his train nearly made up, he instructed one of his brakemen "to pick up a car of ore, set it out on the main line, get water and back onto it"; that he himself went into the station to get "orders" from the station agent regarding the movement of the train when made up; that, while he was getting his "orders," the engine pulled said car of ore and other cars, which were standing on the house track, onto the main line, the brakeman having climbed on said ore car previous to its being moved and released the brake which had been set; that the brakeman cut off said ore car from the train, mounted the car, and attempted to stop it by means of turning up the brake; that the yard in which he was doing the work was downhill; that the car was loaded with ore, and that the brake would not control the car, but that it ran down the track, past the station; that the decedent, seeing the car pass, ran out of the station, mounted the car, and tried to assist the brakeman in stopping it; that the brake partially controlled the car, but did not fully bring it to a stop; that the decedent got down from the car and threw sand on the track to stop the car, and that, when this failed, he climbed upon the car again; that the car proceeded westerly toward McConnico, which is from 3½ to 4 miles west of Kingman; that the grade from Kingman west down to McConnico, where the Chloride line leaves the main line, is 95 feet to the mile; that beyond McConnico the track had two "dips" and corresponding rises; that, when the car reached McConnico, it was moving at the rate of about 35 miles an hour, and, upon being switched to the Chloride line, the car was derailed, and plaintiff's intestate killed. The testimony on behalf of the plaintiff will be further referred to in the opinion.

On the conclusion of plaintiff's case the court granted defendant's motion for a nonsuit, and entered judgment in favor of defendant. The plaintiff brings the case here upon a writ of error.

Burt Chellis and Harris & Swanwick, for plaintiff in error.

E. W. Camp, U. T. Clotfelter, and A. H. Van Cott, for defendant in error.

Before MORROW, Circuit Judge, and HANFORD and WOLVERTON, District Judges.

MORROW, Circuit Judge (after stating the facts as above). Plaintiff's intestate was the conductor on a freight train belonging to the defendant. The train was at Kingman station in Arizona, and was moving eastward. A box car heavily loaded with ore was about to be attached to this train. The car, after being placed upon the main track, did not fully respond to the control of the brake, either because the load was too heavy for the brake pressure or the brake was defective. The conductor got upon the car to assist the brakeman in putting on the brake, but their combined effort was not sufficient to stop the car. The car descended slowly at first, but with gradually increasing speed, on a downgrade to McConnico, about 3½ or 4 miles west of Kingman. The telegraph operator at Kingman had in the meantime notified the train dispatcher at the Needles—61 miles further west—that the local had let a car get away, and that it was running downhill, and the train dispatcher at the Needles had directed the telegraph operator at McConnico to line up switches for this runaway car on the Chloride Branch. This was understood to mean that the car was to be diverted from the main line at McConnico to the switch, and from the switch to the Chloride Branch, a line of road

running north from McConnico. The telegraph operator at McConnico turned the switches as directed, and the runaway car upon which the conductor and brakeman were still riding came down the line, took the main line switch safely, and, running over a curve onto the Chloride Branch road, was derailed, and the conductor killed. The rails on the Chloride Branch were lighter than those on the main line, and failed to hold the car to the track.

The rules defining the nature and extent of the employer's duty in providing for the safety of his employés have often been stated and clearly defined. The only difficulty is in their application to the circumstances of the particular case.

[1] In general terms, the degree of care required of an employer in protecting his employés from injury is the adoption of all reasonable means and precautions to provide for the safety of his employés while they are engaged in his employment, and this degree of care is to be measured by the dangers to be apprehended or avoided. De Graff v. New York Cen. & H. R. R. Co., 76 N. Y. 125, 131.

[2] The employer, whether a natural person or a corporate body, is under obligation not to expose the employé in conducting the employer's business to perils or hazards against which he may be guarded by proper diligence on the part of the employer. Hough v. Railway Co., 100 U. S. 213, 217, 25 L. Ed. 612.

[3] The care required of the employer is that of reasonable diligence; "and reasonable diligence implies, as between the employer and employé, such watchfulness, caution, and foresight as, under all the circumstances of the particular service, a corporation controlled by careful and prudent officers ought to exercise." Wabash R. Co. v. McDaniels, 107 U. S. 454, 460, 2 Sup. Ct. 932, 938 (27 L. Ed. 605).

[4] The failure of the employer to exercise such reasonable diligence, caution, and foresight as a prudent man would exercise under the circumstances is negligence.

[5] The train dispatcher at the Needles represented the defendant in giving the orders respecting this car. Santa Fé Pacific R. R. Co. v. Holmes, 202 U. S. 438, 441, 26 Sup. Ct. 676, 50 L. Ed. 1094; Felton v. Harbeson, 104 Fed. 737, 739, 44 C. C. A. 188; Northern Pac. Ry. Co. v. Mix, 121 Fed. 476, 481, 57 C. C. A. 592; Illinois Cent. R. Co. v. Hart, 176 Fed. 245, 252, 100 C. C. A. 49. And was charged with the full measure of its duty with respect to this car in using every reasonable precaution to prevent an accident.

[6] It was the duty of the defendant to use reasonable diligence in furnishing a safe place for its employé to work in, and whatever risk the employé assumed in carrying on the defendant's business did not exempt the defendant from that duty. Baltimore & Potomac R. R. Co. v. Mackey, 157 U. S. 72, 87, 15 Sup. Ct. 491, 39 L. Ed. 624; Union Pacific Ry. Co. v. O'Brien, 161 U. S. 451, 457, 16 Sup. Ct. 618, 40 L. Ed. 766; Choctaw, Oklahoma, etc., R. R. Co. v. McDade, 191 U. S. 64, 67, 24 Sup. Ct. 24, 48 L. Ed. 96; Sante Fé Pacific R. R. Co. v. Holmes, 202 U. S. 438, 441, 26 Sup. Ct. 676, 50 L. Ed.

1094; Kreigh v. Westinghouse & Co., 214 U. S. 249, 255, 29 Sup. Ct. 619, 53 L. Ed. 984.

The derailment of the car at McConnico was the immediate cause, and the insufficient or defective brake on the car was the primary or efficient cause of the accident. We will first consider the circumstances connected with the immediate cause. The car was derailed upon being thrown from the main track by the turning of the switch by the telegraph operator at McConnico under the direction of the train dispatcher at the Needles. Was this negligence on the part of the train dispatcher? What was the situation? Were there trains on the main track that this car would be likely to come in collision with before it could be stopped, creating an emergency requiring that this car should be switched from the main line at McConnico at all hazards? W. H. Barber, the brakeman who was on the runaway car with the conductor, testified that, when the car struck the downgrade, the conductor asked him:

"Is there anything coming?"

The brakeman testified that he replied:

"No; there is nothing this side of Yucca."

The brakeman referred to the station Yucca, about 20 miles west of McConnico. The conductor said:

"Well, what do you think? Do you think we can stop this car after we get by McConnico?" "All right."

The brakeman testified, further, that, when they got down towards McConnico, he said to the conductor:

"You want to keep your eye skinned down here. We are liable to have these switches against us."

The brakeman then testified that the car—

"turned around the curve there, probably a quarter of mile or less of straight track down to the switch. The switch was red. He was standing up there giving all kinds of signals for them to line up for the main line. Didn't see no one make any attempt to go through. In fact, I didn't see anybody in sight at all myself. * * * There is a lot of difference between the rails in the Chloride line track and in the main line track. * * * With reference to trying to stop the car, we hit the brake up good and hard; figured on doing what we could outside of that after we got down by the tank, some little distance west of McConnico where the grade is more favorable. It was my intention to take that brake off and go down below and look to see how she looked underneath. * * * I never would have rode the car out of Kingman if I hadn't thought the chances for stopping it were favorable. The car was loaded with ore. If the car hadn't been overloaded and the brakes were in good working order. I could have stopped it anywhere I felt like stopping it—if the brakes had been in good working order, I could have stopped the car wherever I wanted it to stop. I could not tell where the trouble was. I didn't try to see."

On cross-examination this witness, referring to a statement made by him to the Claims Department which he had recently read, quoted the following statement:

" 'We figured on stopping the car at about Hancock or Drake.' These are the first and second stations west of McConnico. The car was running west

downgrade from Kingman toward McConnico and the Colorado river. I figured on being able to stop the car at one or the other of those places."

J. C. Concannon, who had been a conductor on the Santa Fé road, testified that he had—

"worked over this line between Kingman and McConnico, and the grade from Kingman west is descending. West of McConnico there is a dip between there and Hancock. There is also another slight dip going into Drake, the station west of Hancock, and, where there is a dip, there is also a corresponding rise."

The station Hancock referred to by the witnesses Barber and Concannon is about three miles west of McConnico, and the station Drake, also referred to by these witnesses, is about three miles west of Hancock. The distance from Drake to Yucca is about 14 miles.

William J. Fordham, the telegraph operator at McConnico, was called by the plaintiff to testify as to the throwing of the switch and the derailment of the car. On cross-examination he testified that he knew at that time that there were two trains coming east, but he did not know where they were. He could not recall what time they were due at McConnico. They were coming east on the main line, so that throwing this car off the main line to the Chloride Branch would prevent a collision between it and the first train. On redirect examination, he testified that he did not know that there was a train on the main line within 25 miles of his station. In other words, he did not know that there was a train anywhere on the main line between McConnico and Yucca.

[7] The plaintiff was entitled to have this evidence, with all the inferences properly deducible therefrom, considered in the light most favorable to her cause of action. Kreigh v. Westinghouse & Co., 214 U. S. 249, 256, 29 Sup. Ct. 619, 53 L. Ed. 984; Masner v. Atchison, T. & S. F. Ry. Co., 177 Fed. 618, 621, 101 C. C. A. 244.

[8] This evidence tended to show that the train dispatcher was negligent in ordering this car diverted from the main track and thrown into the switch at McConnico. There was no evidence of a situation of emergency requiring that this should be done to avoid a collision with a train anywhere within 20 miles west of McConnico. So far as the evidence shows, there was no train anywhere on that section of the track. The downgrade from Kingman to McConnico was about 95 feet to the mile, but it appears that west of McConnico it was less. Within six miles west of McConnico the grade of the track was such that the brakeman on the car had reason to believe that they could bring the car to a standstill. Besides, the car was being followed by an engine which had left Kingman for the purpose of overtaking the car, and there was a reasonable probability that it would overtake the car somewhere on this stretch of clear track and take it under control. But there appears to have been no evidence that the train dispatcher at the Needles knew that this car was heavily loaded, or that the conductor and brakeman were on the car, or that an engine was following the car to take it under control. The only evidence upon this feature of the case was the testimony of Irving J. Whitney, the telegraph operator at Kingman, who testified that:

"After the car had got about 60 or 75 feet by the office, I broke in on the dispatcher's wire, and notified the dispatcher at Needles that the local had let a car get away from them, and it was running down hill. The dispatcher immediately started in to call. I think he called Yucca first a few times; that is about 28 miles from Kingman, and then he called McConnico. Yucca didn't answer, so he then turned to McConnico, and called McConnico. McConnico answered in a very short time. He notified the operator there that the car was running away down the hill, and to set the switches for the Chloride branch. I broke in on top of that and I said, 'Two men on top of car leaving here;' but the operator evidently didn't hear me. He left the office at that time, and was running to set the switches."

The engineer on the train to which this car was about to be attached testified that he saw the car when it had got down to the depot, and saw that the brakeman had not succeeded in stopping it. He proceeds with his testimony as follows:

"And just at that time Mr. Sandidge was standing near the depot. The first I seen of him he ran across the depot platform and joined Barber on the car. And when I saw that the two of them could not stop it—at first I thought they had it stopped. The car was about four blocks, and when a car is away from you four blocks, if it is going slow, it sometimes looks like it is stopped, you know. And I thought they had it stopped for a minute, but, when I saw it going on, I knew they hadn't stopped it, and I started after it, with the engine, and what remained of the cut-off cars with it. I think there were four left. And the last I seen of the car was at the entrance of the canyon, and Conductor Sandidge and Barber were both on top of the car. And I followed the car down. I was making probably 20 miles an hour there, and I had to slow down some, because right at the mouth of the canyon, at the whistle post, is a sharp curve, and if they had stopped the car there, running at 25 to 30 miles an hour, I would have smashed into it. So I had to slow down in case they had stopped the car. When I got around the curve where I could see for a distance of about a mile, the car was nowhere in sight at all. So I followed the car on down to McConnico, and, when I got to McConnico, I seen the car derailed on the Chloride line."

It does not appear that the train dispatcher at the Needles made any inquiry of the telegraph operator at Kingman as to whether the car was loaded or whether any one was on the car or not. It may be that the telegraph operator at Kingman was negligent in not furnishing the train dispatcher with this information when he notified the train dispatcher that the car had got away, and was running downhill; but it still remained the duty of the train dispatcher to ascertain whether any one was on the car, and what was being done at Kingman to stop its downward course.

[9] Furthermore, the negligence of the train dispatcher need not have been the sole and only cause of the accident to charge the defendant with negligence. If his negligence contributed to the accident—that is to say, if his action had a share in bringing about the disaster—the defendant will be liable. Northern Pacific R. Co. v. Mix, 121 Fed. 476, 481, 57 C. C. A. 592. The situation was manifestly fraught with extreme danger, and called for immediate and intelligent action, and the exercise of a high degree of care on the part of the train dispatcher; that is to say, a degree of care to be measured by the dangers to be apprehended and avoided. He was required to exercise such watchfulness, caution, and foresight as, under the circumstances, would reasonably provide for the safety of

all employés exposed to danger. He should have ascertained all the particulars of the situation with respect to this car from the telegraph' operator at Kingman. He should have ascertained whether there was any one on the car, whether it was empty or loaded, and whether the car was being followed by an engine to take it under control. With this information before him, and the knowledge that he had, or should have had, as to the danger of switching a rapidly moving car heavily loaded on to the light rails of the Chloride Branch at McConnico, and with the further knowledge that the main track was clear to the west for the distance of at least 20 miles, he would probably have not given the direction to switch the car at McConnico. It was in any event, in the light of this testimony, a question for the jury to determine whether it was negligence on the part of the train dispatcher to switch the car at McConnico.

With respect to the primary or efficient cause of the accident arising out of the insufficiency or defective condition of the brake, the car was a box car heavily loaded with ore. The brakeman testified that it was overloaded, and the evidence is that the brake was insufficient to hold the car because of its excessive load and weight.

[10] There was testimony obtained by the defendant from one of plaintiff's witnesses on cross-examination tending to show that the trainmen should not take a car out on the main line unless they were certain that the brake was in order, and that it was against the rules to place a car on the main line on the grade and cut it off, leaving it alone. With respect to the condition of the brake, it is sufficient to say that the evidence is not specifically that the brake was out of order, but that it was insufficient for the overloaded car—a defect which probably the trainmen would not and could not discover until found by actual use.

[11] With respect to the second rule, there may be a question whether it would have application to a situation like the one under consideration. In moving cars from switches to main tracks for the purpose of attaching the car to a train on the main track, it is probable that "cutting off" 'may be necessary in some instances, and, when the car is being handled by brakemen with a brake sufficient for the weight of the car, it would not be negligence to do so; at all events, it was a question for the jury.

[12] The defendant in error contends that the switching of this car to the main line was the negligence of the conductor, and that negligence of the defendant with respect to the insufficiency of the brake is not charged in the complaint. We do not so read the complaint. It is alleged:

"That at the time when said car was so switched, as aforesaid, the brakes upon the same were out of repair, and insufficient to hold said car."

And, after reciting the facts relative to the accident in the order of their occurrence, it is alleged:

"That said accident occurred by reason of the negligence of defendant and its servants as employés, as hereinbefore set forth."

This was a sufficient charge of negligence with respect to the insufficiency of the brake.

[13] The defendant contends that this primary cause of the accident in setting the car out on the main track was the sole negligence of the conductor, and that he alone was responsible for the accident. The answer to this contention is that, admitting that there was evidence tending to prove such to be the fact, it would not relieve the defendant of responsibility under the rule of "the last clear chance." That rule as stated by Shearman & Redfield on Negligence, par. 99, is as follows:

"It is now perfectly well settled that the plaintiff may recover damages for an injury caused by the defendant's negligence, notwithstanding the plaintiff's own negligence exposed him to the risk of injury, if such injury was more immediately caused by the defendant's omission, after becoming aware of the plaintiff's danger, to use ordinary care for the purpose of avoiding injury to him. * * * Furthermore, the plaintiff should recover, notwithstanding his own negligence exposed him to the risk of injury, if the injury of which he complains was more immediately caused by the omission of the defendant, after having such notice of the plaintiff's danger as would put a prudent man upon his guard, to use ordinary care for the purpose of avoiding such injury. It is not necessary that the defendant should actually know of the danger to which the plaintiff is exposed. It is enough if, having sufficient notice to put a prudent man on the alert, he does not take such precautions as a prudent man would take under similar notice."

In Inland, etc., Coasting Co. v. Tolson, 139 U. S. 551, 558, 11 Sup. Ct. 653, 655 (35 L. Ed. 270) the trial court charged that, even if the plaintiff had been "guilty of contributory negligence, * * * yet the contributory negligence on his part would not exonerate the defendant and disentitle the plaintiff from recovering, if it be shown that the defendant might, by the exercise of reasonable care and prudence, have avoided the consequences of the plaintiff's negligence." This charge of the trial court was approved by the Supreme Court. The defense of contributory negligence is also not available to the defendant as an objection to the submission of plaintiff's case to the jury.

[14] The plaintiff alleges and it is not denied, that the defendant is engaged in commerce as a common carrier, and by railroad between the state of California and the state of Missouri; that said railroad passes through, and is operated by defendant in the territory of Arizona; that plaintiff's intestate at the time of the accident was in the employ of the defendant serving and acting in the capacity of a conductor on a freight train operated between the states of California and Missouri in the territory of Arizona. The action is therefore within the provisions of Act Cong. April 22, 1908, c. 149, 35 Stat. 65 (U. S. Comp. St. Supp. 1909, p. 1171), entitled "An act relating to the liability of common carriers by railroad to their employés in certain cases." In section 3 of that act it is provided as follows:

"The fact that the employé may have been guilty of contributory negligence, shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employé."

Under this statute the defense of contributory negligence was a question for the jury.

[15] It is next contended by the defendant that the conductor assumed the risk of handling the car as he did when he went upon the car and remained upon it after having failed to stop it. Passing the objection interposed by the plaintiff that there is no question of assumption of risk in this case because it is an affirmative defense and has not been pleaded, we will consider the more substantial objections to this defense. The conductor went upon the car in the performance of a duty to assist the brakeman in the effort to bring the car under control. It was a duty incident to his position as conductor of the train, and one he was not at liberty to abandon, unless the danger was so obvious that any ordinarily prudent person would not remain and incur such danger. As said by Shearman & Redfield on Negligence, § 211:

"If every man should cease from work upon the instant of discovering that his safety was imperiled by the negligence of some other person, the business world would come to a stand. If every servant on a railroad or in a factory should refuse to work by the side of a negligent fellow servant or with defective materials, immediately upon becoming aware of the fact, such enterprises could never be carried on. Obviously a reasonable time must be given for removal of the defect; and meantime the business must be carried on with no prejudice to the servant's rights, unless the risk is so great that no one, acting with ordinary prudence, would go on under the circumstances."

[16] There is the further objection to this defense that, when the employer claims the exemption that the employé assumes the risk of the employment in which he was engaged when injured, the employer must not himself have been guilty of negligence with respect to such employment.. In other words, the employé assumes the risk of dangers incident to the employment, but not the employer's negligence. Hough v. Railway Company, 100 U. S. 213, 25 L. Ed. 612; Wabash Ry Co. v. McDaniels, 107 U. S. 455, 2 Sup. Ct. 932, 27 L. Ed. 605; N. P. R. R. Co. v. Herbert, 116 U. S. 642, 6 Sup. Ct. 590, 29 L. Ed. 755; N. P. R. R. Co. v. Babcock, 154 U. S. 190, 14 Sup. Ct. 978, 38 L. Ed. 958; Union Pac. Ry. Co. v. O'Brien, 161 U. S. 451, 457, 16 Sup. Ct. 618, 40 L. Ed. 766; Choctaw, Oklahoma, etc., R. R. Co. v. McDade, 191 U. S. 64, 69, 24 Sup. Ct. 24, 48 L. Ed. 96.

The first question then to be determined was whether the defendant was guilty of negligence in dealing with the situation. If it was, the question of the assumption of risk by the deceased did not arise.

It follows from these considerations that, as the evidence of defendant's negligence was sufficient to take the case to the jury, it should have been so submitted, and determined as the primary question in the case. Had the jury found that the defendant had not been guilty of negligence, that would have ended the case, but, on the other hand, had they found that the defendant was guilty of negligence, then the question whether the deceased was also chargeable with negligence would have been open for determination.

The judgment of the lower court is accordingly reversed, with directions to grant a new trial.