CHARLES M. HADLEY, ADMINISTRATOR, APPELLEE, V. UNION
PACIFIC RAILROAD COMPANY, APPELLANT.

FILED FEBRUARY 19, 1916.   No. 18439.

1. **Damages.**  A verdict for plaintiff assessing the total damages at
$25,000, under the evidence set out in the opinion, *held* to be ex-
cessive.

2. **Statutes: CONSTRUCTION.**  In construing a federal statute, this
court will follow the construction placed upon it by the federal
courts.

3. **Damages: REMITTITUR,**  In an action under the federal employers'
liability act (35 U. S. St. at Large, ch. 149, p. 65), where the court
has instructed the jury that the contributory negligence of
deceased has been shown, but the jury makes no deduction in the
amount of the verdict because of such negligence, the court may
order such remittitur as seems proper under the evidence.

4. **Damages: APPORTIONMENT.**  A general verdict for the plaintiff may
be returned by the jury in an action brought by the administrator
under the federal employers' liability act for the benefit of the
widow and minor children of the deceased employee without ap-
portioning the damages among the beneficiaries.

APPEAL from the district court for Cheyenne county:
HANSON M. GRIMES, JUDGE.  *Affirmed on condition.*

*Edson Rich, A. G. Ellick, B. W. Scandrett* and *Miles &
McIntosh,* for appellant.

*Wilcox & Halligan, R. W. Devoe* and *J. M. Swenson,*
contra.

MORRISSEY, C. J.

This is an appeal from a judgment recovered against
defendant in an action brought under the federal em-
ployers' liability act, 35 U. S. St. at Large, ch. 149, p. 65.
Plaintiff is administrator of the estate of Charles M.
Cradit, who died March 14, 1913, from injuries received
while in the employ of defendant as a railroad brakeman
on one of its interstate freight trains.  The suit was for the

benefit of the widow and two surviving children. Deceased received his injuries while in the caboose of his train, when it was run into and wrecked by the engine of another of defendant's trains.

This accident occurred at a station known as Mile Post 426, located between Sidney, Nebraska, and Cheyenne, Wyoming. The evening before Cradit left Cheyenne with his train, designated as extra 504 east, for Sidney, Nebraska, which is 102 miles distant from Cheyenne, and this section of the road, constituting a freight division, is known as the fourth district of the Nebraska division. An extra freight train is designated by the number of its engine and the direction in which it is going. When Cradit's train left Cheyenne, the weather conditions were unsettled on that division. They continued to grow worse during the night, and at the time of the accident a severe storm or blizzard was raging. Closely following extra 504 east was another freight train, designated extra 501 east. Defendant's line was double-tracked west to Mile Post 426, and from that point west to Dix its line was single-tracked, where it again diverges into a double track. At all points on its system it is equipped with an automatic block signal system by which the track is divided into blocks, and by which a red light is displayed one block in the rear of every train, and this light remains red until the train has passed out of that block and into another, when the light turns to green. Red lights signify danger, and green lights signify that the track is clear. These two trains appear to have been run in the usual way; extra 501 east being a block behind extra 504 east until they reached Dix. Here extra 504 pulled in on a passing track. And soon thereafter extra 501 arrived, and the two trains stood for some time on the tracks at Dix. The storm had become so severe that the acetylene headlights were extinguished, and common white lanterns were substituted therefor.

It is claimed that, while these trains were waiting at Dix for passenger trains to go through, the deceased and his conductor went to the cab of engine 501 and visited with

Hadley v. Union P. R. Co.

the crew of that engine; that conductor Phillips of extra 504 east had a conversation with Engineer Cameron and Fireman Long of extra 501 east, in the presence of Cradit, in which the engineer said that it was hard to see the block signals, and asked Conductor Phillips to do a good job of flagging, and "use lots of fusees all the way down," and also asked that, if stops were made, fusees be thrown out and a torpedo put down.

Cradit's train left Dix at 2:35 A. M., and arrived at Potter, the next station east, at 3:05 A. M., thus clearing the block for extra 501 east, which thereupon left Dix and arrived at Potter at 3:35 A. M., where it took water and departed at 3:45 A. M. The engineer pulled out of Potter without orders from the conductor, and the conductor was left at that station while his train proceeded. While these trains had been proceeding eastward, extra freight 510 west had been made up at Sidney, and started for Cheyenne at 1:10 A. M.; but the storm was so violent that it required 1 hour and 55 minutes to reach Mile Post 426, 11 or 12 miles west of Sidney, arriving there at 3:05 A. M. The engine's supply of water had been exhausted, and this condition was reported to the train dispatcher at Sidney. The dispatcher thereupon ordered extra 504 east to pick up engine 510 west and take it to Sidney. The severity of the storm was such that lanterns could be seen but a few feet. The switch had been left partially open and blocked by snow, and the conductor of the west-bound train testified that in making his way from the caboose to the station he could not face the storm, but was compelled to walk backward, and that it took him 35 minutes to travel the length of his train. Communication with the train dispatcher was had over the telephone, and the conductor testified that the dispatcher was notified that the storm was so severe that the trainmen could not see, and was advised to let extra 504 east proceed and have extra 501 east pick up the engine of the west-bound train. This the dispatcher refused to do, and the engine crews began the work of

clearing the switch to make the necessary couplings to pick up the stalled engine.

Cradit's train had reached Mile Post 426 about 3:35, and the engineer "whistled out a flag." While the engine crews of extra 504 east and 510 west with their head brakemen were endeavoring to clear the switch and couple the stalled engine into the train of extra 504 east, extra 501 east, which left Potter without its conductor, ran past the block signals, and collided with the caboose of extra 504 east, killing Cradit, Conductor Phillips, three stockmen, injuring two others and setting fire to the caboose. This collision occurred 30 or 40 minutes after the arrival of Cradit's train at Mile Post 426.

Under defendant's rules, it was Cradit's duty, when his train stopped and the engineer "whistled out a flag," to go out and put down torpedoes, throw out fusees, and protect his train from a rear-end collision. This he did not do.

There was a verdict for plaintiff in the sum of $25,000, which the trial court reduced to $15,000, and defendant has appealed, urging 38 separate assignments of error.

Plaintiff charges defendant with negligence in operating the three freight trains, heretofore mentioned, while this violent storm was raging, and in permitting extra 501 east to run in such close proximity to extra 504 east. It is claimed that it was negligence on the part of the assistant superintendent at Sidney to send out the west-bound train under the circumstances, and with knowledge of the storm, and that it was negligence on the part of the train dispatcher in directing extra 504 east to pick up the stalled engine, when that train ought to have been permitted to continue into Sidney and let the train which he knew was following in close proximity, and which finally caused the accident, pick up the engine; that it was negligence for extra 501 east to be operated without its conductor, and for its engineer to run past the block signals.

The wind was blowing at the rate of 30 miles an hour or more; snow was falling, or blowing; there was difficulty in observing the block signals, if, in fact, they could be ob-

Hadley v. Union P. R. Co.

served at all, and the dispatcher and assistant superintendent knew that it was an unusual storm. But the passenger and mail trains went over the line during the night. None of the trainmen had reported that it was impossible to see the block signals, or that the headlights were not burning. It cannot be said that defendant was guilty of actionable negligence for a mere failure to tie up its trains. On the other hand, it is clear that there was negligence on the part of the engineer of extra 501 east in leaving the station at Potter, without his conductor, and proceeding through this storm without observing the block signals, set at danger, in the rear of extra 504 east. These block signals are admitted to have been working, but the members of the engine crew claim they were unable to see them because of the severity of the storm. However, they knew the distance from Potter to Mile Post 426, and the location of these block signals, and also knew that they were following closely behind another train, and that with the weather conditions prevailing that train was likely to be stalled, and they had been warned by the dispatcher that extra 504 east was at Mile Post 426, "and might not be out before they got there, and to look out for her." The dispatcher knew that it required 1 hour and 55 minutes for the west-bound train to make the run of 11 or 12 miles to Mile Post 426, and that in doing so the engine exhausted its supply of water. He knew that east-bound extra 504 had left Potter only 36 minutes ahead of extra 501 east. When he ordered extra 504 east to stop at Mile Post 426 and do work which would require some time under the existing conditions, he was requested by the conductor of the west-bound train and the engineer of extra 504 east to let the first train proceed and leave the second train to do the switching and pick up the stalled engine. The conductor of the west-bound train testified that, through the operator, he had a conversation over the telephone with the dispatcher, and "told him we could not see, the storm was so severe, and to let extra 504 go." The conductor asked to

have the first east-bound train proceed and leave the second east-bound train to pick up the engine of his train. It would seem that due regard for the safety of the employees would have impelled him to grant this request. Had it been granted, in all probability the accident would have been avoided. "Furthermore, the negligence of the train dispatcher need not have been the sole and only cause of the accident to charge the defendant with negligence. If his negligence contributed to the accident — that is to say, if his action had a share in bringing about the disaster — the defendant will be liable." *Sandidge v. Atchison, T. & S. F. R. Co.*, 193 Fed. 867, 875.

Appellant justifies the action of the dispatcher in this regard by saying that, had he granted this request, it would have delayed the removal of the west-bound train an hour or two, and that by that time the snow would have accumulated around this train in such quantities as to block traffic on its lines. If the dispatcher realized that the storm was of such severity as this, he ought to have known that there was grave danger of train crews being unable to see the block signals, and, as he was running the trains in close proximity, prudence would have dictated that he grant the request of the trainmen, which in itself was warning of danger, and permit the first train to proceed.

Appellant denies that any negligence on the part of the assistant superintendent was shown, or that the acts charged constitute actionable negligence, and says the court erred in refusing its requested instructions withdrawing from the jury consideration of the acts of negligence charged against him. The conductor of the west-bound train testified that he and the assistant superintendent had different conversations before he took out the train. The conductor advised that the train be split in two, because, owing to the severity of the storm, the engine could not pull the train through to Potter, the next watering station. The assistant superintendent assisted in cleaning out the turntable that night, and at the second conversation they had the assistant superintendent stated in the most positive lan-

guage that there was "no use of running the train." It appears that he knew the weather conditions; that the conductor, who was an experienced railroad man, called his attention to the impracticability of sending out the train; that he admitted the lack of necessity for doing so, and yet, in the face of this, he sent it out. Of course, this act alone did not cause the accident, but it formed one link in a chain of incidents culminating in the wreck. The negligence of the engineer of extra 501 east and of Conductor Phillips of extra 504 east and the contributory negligence of the deceased is conclusively shown. It follows that there was no error in submitting these issues to the jury.

It is urged by appellant that there can be no recovery, because Cradit assumed the risk incident to his employment and to the peculiar circumstances under which the trains were operated that night. It is said in the brief that the action of Cameron in running his train past the block signals would constitute actionable negligence, "unless Cradit, by his conduct, had waived his right to predicate a cause of action thereon, or was aware of the fact that Cameron was not depending upon the block signals for the safe operation of his train, and was willing to proceed in the face of that danger, thereby assuming the risk." Engineer Cameron testified that he told Conductor Phillips, in the presence of Cradit, to do a good job of "flagging," and appellant seriously contends that Cradit knew that the engineer in proceeding east from Dix would not depend upon the block signals, but upon the "flagging" to be done by Cradit; that, because of this alleged conversation and understanding, Cameron no longer owed Cradit the duty to operate his train under the block signal system. There was a conflict in the testimony as to this alleged conversation and agreement. The jury made a special finding that the conversation was not had.

In *Grand Trunk W. R. Co. v. Lindsay*, 201 Fed. 836, plaintiff was a switchman on defendant's railroad, and in making couplings was obliged to go between the cars. There was conflicting evidence respecting the giving of a signal to the

engineer. As in this case, the jury found for the plaintiff. In the concluding paragraph of the opinion on rehearing the court said: "Under the employers' liability act, plaintiff's negligence, contributing with defendant's negligence to the production of the injury, does not defeat the cause of action, but only lessens the damages, and, if the cause of action is established by showing that the injury resulted 'in whole or in part' from defendant's negligence, the statute would be nullified by calling plaintiff's act the proximate cause, and then defeating him, when he could not be defeated by calling his act contributory negligence. For his act was the same act, by whatever name it be called. It is only when plaintiff's act is the sole cause — when defendant's act is no part of the causation — that defendant is free from liability under the act."

In *Wright v. Yazoo & M. V. R. Co.,* 197 Fed. 94, the court said: "While the doctrine of assumption of risk sometimes shades into that of contributory negligence, there is a clear distinction between the doctrines, an employee being held to assume the risk of ordinary dangers of his occupation, and also those risks which are known to him, or are so clearly observable that he may be presumed to know of them, while contributory negligence constitutes omission of an employee to use those precautions for his own safety which ordinary prudence requires."

The finding of the jury on this question is conclusive of the question.

It is urged that the verdict is so excessive as to indicate passion or prejudice on the part of the jury. Deceased was 31 years of age, with a life expectancy of approximately 34 years. He was earning from $85 to $100 a month, but used from $15 to $18 a month for his personal expenses while out on his work. The remainder was contributed to the support of his family. No proof was offered to show that deceased's earning capacity would increase with the years. "It ought to be assumed that plaintiff proved his earnings at their best." *Hoffman v. Chicago & N. W. R. Co.,* 91 Neb. 783.

Tables of expectancy and the present worth of judgments are always more or less unsatisfactory. It is never possible to ascertain with mathematical accuracy the pecuniary loss which a family will suffer from the death of the breadwinner, but, taking his wages at $100 a month, the maximum, and deducting therefrom the amount which he spent for his personal expenses, and calculating the present value at the date of the verdict, the evidence will not sustain a verdict in excess of $18,000; but the verdict as returned is not so excessive as to warrant the court in setting it aside. We think $18,000 may reasonably be taken as the gross amount of damages. The court properly directed the jury that deceased was guilty of contributory negligence, and that the damages should be diminished in proportion to the amount of negligence attributable to him. By special finding the jury found that nothing should be deducted, and no deduction was made by the jury. By direction of the trial court a remittitur of $10,000 was entered, and the verdict permitted to stand at $15,000. The record does not disclose the court's reasons for making the remittitur; whether it was because he regarded the original verdict as $10,000 too high; whether he made the deduction ordered because of the contributory negligence of deceased, or whether he thought it ought to be deducted for both reasons. In any event, it is not material to a disposition of the case here.

Having reached the conclusion that without making any deduction because of the contributory negligence the verdict ought to be reduced to $18,000, we are now required to determine what amount, if any, should be remitted because of deceased's contributory negligence. Our right to determine this matter is questioned by appellant, and in place of making the reduction we are asked to reverse the case for a new trial. This being a federal statute, the interpretation placed upon it by the federal courts will be followed. *South Covington & C. Street R. Co. v. Finan's Adm'x*, 153 Ky. 340.

In *Yazoo & M. V. R. Co. v. Wright,* 207 Fed. 281, the refusal of the trial court to instruct that deceased was guilty of contributory negligence was assigned as error, and on the motion for a new trial it was found that he was guilty of contributory negligence. But the court ordered a remittitur, which was accepted, and the court said the railroad company could not complain.

In *Pennsylvania Co. v. Sheeley,* 221 Fed. 901, the court had this very question before it, and disposed of it in the following language: "It seems probable that the jury did not make allowance for contributory negligence as the statute requires. There must, therefore, be another trial, unless this error can be cured by a remittitur. In making to plaintiff an offer of conditions upon which part of a judgment may stand, we cannot take the place of the jury. We must only be sure that no substantial injustice comes to the party against whom the judgment is maintained. If the conditions so fixed seem unjust to the plaintiff, he can protect himself by declining to accept the offer. The utmost which defendant in this case can claim is that the jury made no allowance on account of Sheeley's conduct, and so that the $6,500 represents the total damages. The negligence of the engineer being established according to the theory of the petition, we think there would be no fair room to say that Sheeley's negligence should be considered as more than one-half as much as the engineer's, or more than one-third of the whole. It follows that if plaintiff desires to accept a judgment for two-thirds of the amount found below, and within 30 days files evidence of that acceptance in accordance with our practice, the judgment will be affirmed; otherwise, it will be reversed and remanded for new trial."

In the instant case negligence may be traced to so many different people that it is difficult to determine the proportion that ought to be charged to deceased, but surely it cannot be more than one-fourth of the whole, and this deduction will be made from the $18,000, which we find to represent the total damages.

The point is made in the brief that there is not sufficient evidence to prove the separate pecuniary loss of each of the parties for whose benefit the action was brought. The jury is not required to apportion the damages among the beneficiaries. A general verdict for the plaintiff may be returned. In a very recent case the supreme court of the United States passed upon this question and said: "Under Lord Campbell's act (9-10 Victoria, ch. 93, sec. 2) and in a few of the American states the jury is required to apportion the damages in this class of cases. But even in those states the distribution is held to be of no concern to the defendant, and the failure to apportion the damages is held not to be reversible error (*Norfolk & W. R. Co. v. Stevens, Adm'r,* 97 Va. 631, 46 L. R. A. 367; *International & G. N. R. Co. v. Lehman,* 30 Tex. Civ. App. 3); certainly not unless the defendant can show that it has been injured by such failure. The employers' liability act is substantially like Lord Campbell's act, except that it omits the requirement that the jury should apportion the damages. That omission clearly indicates an intention on the part of congress to change what was the English practice so as to make the federal statute conform to what was the rule in most of the states in which it was to operate. Those statutes, when silent on the subject, have generally been construed not to require juries to make an apportionment. Indeed, to make them do so would, in many cases, double the issues; for, in connection with the determination of negligence and damage, it would be necessary also to enter upon an investigation of the domestic affairs of the deceased—a matter for probate courts, and not for jurors. If, as in the *McGinnis* case, the plaintiff sues for the benefit of one who is not entitled to share in the recovery (*Taylor v. Taylor,* 232 U. S. 363; *North Carolina R. Co. v. Zachary,* 232 U. S. 248), and if her inclusion in the suit might increase the amount of the recovery, the defendant may raise the question, in such mode as may be appropriate under the practice of the court in which the trial is had, so as to secure a ruling which will prevent a recovery for one not

entitled to share in the benefits of the federal act. But no such question was or could have been raised in the present case, since, as matter of law, the wife and minor children were all to be treated as entitled to share in the amount recovered for the death of the husband and father." *Central V. R. Co. v. White*, 238 U. S. 507.

It is not necessary to further extend the discussion of the questions pressed upon our consideration. Those not discussed have been fully considered, but are not thought to be controlling. We are of the opinion that the case was fairly presented to the jury, and that no substantial error of law to the prejudice of appellant was committed, and, it is therefore ordered that, if the plaintiff file a remittitur in the sum of $1,500, leaving the judgment $13,500, within 20 days, the judgment of the district court, as thus reduced, will be affirmed; otherwise, the judgment will be reversed and the cause remanded for further proceedings.

AFFIRMED ON CONDITION.