## MITCHELL v. TOLEDO, ST. L. & W. R. CO.

(Circuit Court of Appeals, Sixth Circuit. June 26, 1912.)

### No. 2,218.

1. TRIAL (§ 178*)—DIRECTION OF VERDICT—CONSIDERATION OF EVIDENCE.

On a motion to direct a verdict, the court cannot properly undertake to weigh the evidence, but must take that view of it most favorable to the party against whom the motion is made, and from that evidence and the inferences reasonably and justifiably to be drawn therefrom determine whether or not, under the law, a verdict might be found for such party.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 401–403; Dec. Dig. § 178.*]

2. MASTER AND SERVANT (§§ 286, 288, 289*)—ACTION FOR INJURY TO SERVANT—QUESTIONS FOR JURY.

Plaintiff's intestate was employed in the yards of defendant railroad company, and was directed by the foreman to assist an inspector in replacing a door which had fallen from a car some distance from where the car then stood, coupled to others, on a switching track. Alongside of such track was another, on the side where the door was to be placed, on which there were also cars, leaving a space of two feet between the lines. The door weighed 200 pounds, and, when the two men had carried it around the string of cars where they must go between the two lines, they stopped to rest, standing the door on edge and each holding to it. While so standing an engine shoved other cars against those standing, causing them to start suddenly, and the end car ran over the door, was partially derailed, and plaintiff's intestate was killed. From where the men were they could not see the engine or cars approaching. *Held*, that it was the duty of defendant to take some measure to protect its car repairers when directed to work on cars on tracks where switching was being done, not only while actually at work thereon, but while going to such work by the only way possible, and that it could not be said as matter of law that it was not negligent, nor that deceased assumed the risk of such negligence or was chargeable with contributory negligence, but such questions were for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1005, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050, 1068–1088, 1089, 1090, 1092–1132; Dec. Dig. §§ 286, 288, 289.*]

In Error to the Circuit Court of the United States for the Western Division of the Northern District of Ohio.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

Action at law by Thorn W. Mitchell, administrator of the estate of Henry Cary, deceased, against the Toledo, St. Louis & Western Railroad Company. Judgment for defendant, and plaintiff brings error. Reversed.

G. B. Keppel, of Toledo, Ohio (Charles A. Thatcher, on the brief), for plaintiff in error.

C. A. Schmettan, of Toledo, Ohio (Clarence Brown, on the brief), for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. The administrator brought suit in the court below "under the general laws of the state of Ohio and of the United States" for the benefit of the widow and child of the deceased, Henry Cary, to recover damages on account of fatal injuries alleged to have been received by Cary on July 16, 1906, without fault on his part, but through negligence of the railroad company. Judgment upon a directed verdict was rendered for the railroad, and the case is prosecuted here on error. While in the employ of the company in its railroad yards at Delphos, Ohio, Cary undertook to assist one of the company's car inspectors, Foster, pursuant to direction of their foreman, to replace a door upon a car. The door was discovered by the inspector at a point about 400 feet away from the car. Foster and Cary carried the door to a point near the side of the car on which the door was to be replaced, when the accident occurred. The car to which the door belonged was one of 10 cars standing on a switch running north and south. This switch was known as No. 6, and was one of a number of substantially parallel switches connecting with and running north from the lead track, the latter running east and west. Foster and Cary carried the door between switches Nos. 5 and 6 northwardly to the end of the line of cars standing on No. 6, and across that track to the space between Nos. 6 and 7. The door weighed about 200 pounds, and, when the point last mentioned was reached, Cary said to Foster, "Let's set it down," and this was done. While the men were holding the door, with one of its edges on the ground, a switch engine pushing 18 cars was run from the lead track into switch 6 and against the south end of the cut of 10 standing cars before mentioned. This set the standing cars in motion, and the door was struck by the north car, which resulted in derailing its front trucks and driving the car across the space between 6 and 7 until it struck a car on 7. Cary was thrown under the derailed car and injured to such an extent that death ensued some hours later.

It is important to study the situation as it existed at the time the derailed car was set in motion. While the men were at opposite ends of the door and holding it with one edge resting on the ground, Cary was standing with his back to the south and his left hand on the door, and Foster was facing south with his right hand on the door. Foster testified that the door was then "standing straight up and down," and that the distance between Cary's end of the door and the car

197 F.—34

was "in the neighborhood of three or four feet," but whether the door then stood within the line of the overhang of the car subsequently derailed, or whether Cary or the door was struck first or just what portion of the derailed car struck the door, is not clearly shown, though there was testimony other than Foster's tending to show that the derailment was caused by the west wheels of the front truck of the derailed car passing over the door. It was conceded by counsel for the railroad "that standing between the cars at that point you could not see the place where the engine was." In describing what happened when the men were so holding the door, Foster testified:

"We was (sic) standing there, holding the side of the door. and all at once the bunch of cars that was standing there was struck and in some way he (Cary) got caught, and before I could hardly realize what happened I saw him go under the car behind the first pair of trucks. * * * It was so unexpected and so quick that I couldn't catch—the first I realized after the striking of the cars I saw him going under the cars. * * *

"Q. Were you able to tell at all that the engine was approaching and about to strike those cars? A. Not where we were standing holding the side of the door."

The car to which the door in question belonged was next south of the derailed car. Thus, at the time of the accident, the men had reached a point within about one car's length of the car on which they were to replace the door. It is plain that they had no thought of the approach of the switch engine and cars it was pushing, or of the resulting movement of the car that was derailed. This movement was not only unexpected, but sudden. If Foster is right in his testimony that the door was being held in an upright position, it is difficult to see how it came into contact with the north car and caused its derailment, unless the suddenness of the car movement startled one or both of the men, and so caused one or both to change the position of the door. True, they might have placed and held the door within a line corresponding with the outside of the overhang of the derailed car, but in that event it is hard to understand why Cary was not struck by the end of the car instead of being thrown under it behind the front trucks. In either event, the sudden movement of the cars was calculated to surprise the men and throw them off their guard. The evidence tends to show that the standing cars were susceptible of nearly simultaneous movement, because they were equipped with automatic couplers and coupled together. One of defendant's switchmen testified that the movement caused by a stroke at one end of such a string of cars is communicated to the other end in four or five seconds, also saying, "It is awful close."

It was practically admitted by defendant that nothing was done by the company in this instance to prevent a movement of the cars. This admission was made in connection with an offer of testimony as to the practice of railroads to protect car repairers. Witnesses of some experience in such matters were called—one particularly of considerable experience as yardmaster first for the defendant company, and for the Lake Shore at the time he was on the witness stand—to show this practice generally, including that of defendant. The effort seems, in substance, to have been to prove that the practice or custom was,

through the foreman of car repairers, to give notice to the switching crew that repairs were about to be made or were being made on cars standing on switches, or by placing a flag at each end of lines of standing cars in advance of undertaking to repair any of them. Objections to the introduction of all such testimony were sustained and exceptions reserved, the learned trial judge holding as matter of law, in the first instance, "that it was the duty of the company to protect these men against a movement of the cars"; and, further, "that it does not make any great amount of difference, it seems to me, how that duty was to be performed." Later the ruling was restated thus: "I shall say to this jury that that was the company's duty, to prevent the cars from moving while this door was being put on." Foster having testified on cross-examination in substance that there was room between the opposite car on switch 7 and the position of the car door at the time of the accident to place the door further west, and also to enable Cary to stand "in the clear," and so avoid the accident, the court believed that the men had a choice of positions, and that they "chose their own position, a position of danger." Counsel for the administrator thereupon sought and the court denied leave to amend the petition by alleging:

"That it was the practice in the yard for Mr. Murray, the foreman of the car repairers, to give notice to the switching crew whenever he had ordered repairs or knew that repairs were being made on a car standing upon a switching track, and that this notice would be given at the time or immediately after he gave his orders or knew that the work was being done."

Regardless of the proposed amendment, however, can it be safely affirmed as matter of law that the evidence does not tend to prove a case for submission to a jury? As we understand the ultimate view of the trial court, it was not that a case for the jury would not have been presented if Cary had received his injuries through this movement of the cars, while the men were engaged in replacing the door (possibly, though it is by no means certain, the court meant that a prima facie case would have been presented even if it had appeared that the men were carrying the door at the time the movement of the cars occurred); but that since they failed to reach the place of work by something more than a car length (and set the door on the ground, and, in the court's view, in a position of danger), the administrator's case was open to the defenses of assumption of risk and contributory negligence.

It was insisted in argument, and is in the brief, that there is no proof of negligence on the part of the company; that there is proof that Cary was guilty of contributory negligence; and, further, that he assumed the risk of the danger causing his death. Did the company owe the men any duty of care, while they were engaged in removing the door from the place where it was found to the point of replacement? Counsel's theory is that the men were entitled to no more concern on the part of the company—certainly while standing and holding the door—than yardmen generally are, who are moving about or standing in the yards, and not burdened by a load. Still it was admitted in argument, and we think rightly, that, if the injury

had been inflicted by this movement of the cars while the men were carrying the door across track 6 at a point north of the north car, a case for the jury would have been made out. One reason for this may be found in certain conditions which clearly justified the men in so crossing the track. There was room to carry the door in a horizontal position, as the men did carry it, between tracks 5 and 6, but they would have been compelled to carry it in a perpendicular position (at least for the distance occupied by the 10 standing cars), if they had attempted to pass between tracks 6 and 7, for 7 was filled with cars. The space between the side of the car that was subsequently derailed and the car opposite, on track 7, was measured by employés of the company and found to be "about two feet." The car attached to the derailed car was a refrigerator car—the one to which the door belonged—and this explains the weight of the door. Foster estimated the dimensions of the door to be about 5½ feet in height and about 6 feet in length. It is not too much to say, we think, that the danger of carrying a door of 200 pounds in weight and of the dimensions stated, in a space of 2 feet between cars, involved as much danger from sudden and unexpected movement of the cars as would have been encountered in the work of replacing the door. It is hard to understand why a duty is conceded in respect of the one and denied as to the other. Such concession is so far in accord with the settled rule touching the obligation to protect car repairers while engaged in their work as not to require citation of authority. This duty of the company certainly cannot, as a matter of law, be rightly said to have been limited to the particular portion of the car on which the door was to be replaced. In Northern Pac. Ry. Co. v. Schoeffler, 193 Fed. 627, 629 (C. C. A. 9th Cir.), when speaking of the duty of the railroad company to furnish defendant, as a car repairer, a safe place in which to work and to keep it reasonably safe during the progress of the work, Judge Gilbert said: "The duty was not confined to the spot in which the defendant in error regularly or principally worked." True, rules were there shown to have been adopted for the protection of men engaged in repairing cars on repair tracks, and that the injured employé relied upon the observance of the rules when leaving his place of work to go in quest of a necessary jackscrew; but there is no perceivable distinction between the principle there announced and the one that seems to be applicable here. While it is not clear whether it was meant in the amended petition in the present case to allege that the company had not adopted any rule or means to protect employés engaged in repairing cars, and while rules and regulations in this behalf are alluded to in the amended answer in setting up the defense of alleged contributory negligence (denied in the replication), yet the proof offered as stated was not admitted, and no rule or regulation appears in the record. But this state of pleading did not relieve the company of the duty to adopt some means for protecting its car repairers; indeed, for protecting these men when about to enter, if Cary had not already entered, the passage leading to the side of the car on which they were to restore the door.

This duty is accentuated by other features of the case. After show-

ing the distance between tracks 6 and 7, plaintiff proved that repair tracks were maintained in the yards, but was not permitted against objection to show the distance between such tracks. Further, plaintiff sought and failed to prove by Foster that he had told the foreman, who gave the order to replace the door, that the car was located on a switching track, but Foster testified that the only place he did any car inspection was on switching tracks, and that he told the foreman he found the car in the yard with the side door off and the door lying to the east of the machine shop; that, if he would give him help, he would put the door on the car; and, further, that "just then Henry Cary came along, and he (the foreman) says, 'Take Henry,' and so I took Henry." Without considering its weight, we think this evidence is open to legitimate inference that the foreman understood that Foster found the car on a switching track while engaged in the discharge of his duty of inspection, rather than on a repair track. Can it be safely assumed as a matter of law that the company was not, through this foreman, chargeable with notice of this order, or with any concern as to the place where it was to be executed, or with the dangers attending the removal of the door to such place, through sudden movement of the cars? We think not.

[1] To say, then, that a prima facie case of negligence was not made, is to fail to observe evidential conditions and inferences clearly disclosed by the record. Repetition of the rule is scarcely justifiable that on the motion to direct a verdict the court could not weigh the evidence. As the present Mr. Justice Lurton said in Mt. Adams & E. P. I. P. Ry. Co. v. Lowery, 74 Fed. 467, 477, 20 C. C. A. 596, 610 (C. C. A. 6th Cir.), when speaking of the functions of the court in passing upon a motion to direct:

"* * * He cannot properly undertake to weigh the evidence. His duty is to take that view of the evidence most favorable to the party against whom it is moved to direct a verdict, and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, determine whether or not, under the law, a verdict might be found for the party having the onus."

[2] It remains briefly to consider the conduct of Foster and Cary, especially of the latter. They had crossed track 6, set the door on the ground, and were holding it in an upright position. It is not contended that Cary's desire to rest signified neglect of duty on his part. The claim is that the door should have been placed nearer than it was to track 7, and that Cary should have stood nearer to it. Why should the men have anticipated a movement of the cars on track 6 rather than of those on track 7? But we need not attempt to state inferences that might reasonably and justifiably be drawn from the evidence. It is enough that on the motion to direct it could not be said as a matter of law either that Cary assumed any risk of danger resulting from defendant's negligence (Northern Pac. Ry. Co. v. Schoeffler, supra, 193 Fed. 630; Sandidge v. Atchison, T. & S. F. Ry. Co., 193 Fed. 867, 878 [C. C. A. 9th Cir.]; Choctaw, Oklahoma, etc., R. R. Co. v. McDade, 191 U. S. 64–67, 24 Sup. Ct. 24, 48 L. Ed. 96), or that the facts touching Cary's conduct would not admit of any

reasonable inference except that of contributory negligence (Lyddy, Adm'x, v. Louisville & Nashville R. R. Co., 197 Fed. 524, decided by this court June 8, 1912). See, also, Kane v. Northern Central Ry., 128 U. S. 95, 96, 9 Sup. Ct. 16, 32 L. Ed. 339; Richmond & Danville Rd. Co. v. Powers, 149 U. S. 43, 45, 13 Sup. Ct. 748, 37 L. Ed. 642; Rochford v. Pennsylvania Co., 174 Fed. 81, 84, 98 C. C. A. 105 (C. C. A. 6th Cir.); Snyder v. New York Cent. & H. R. R. Co., 176 Fed. 346, 347, 99 C. C. A. 620 (C. C. A. 2d Cir.); Pioneer S. S. Co. v. McCann, 170 Fed. 878, 96 C. C. A. 49 (C. C. A. 6th Cir.); Big Brushy Coal & Coke Co. v. Williams, 176 Fed. 529, 532, 99 C. C. A. 102 (C. C. A. 6th Cir.). If amendment of the pleadings should be deemed necessary, and seasonable application upon sufficient showing in that behalf be made, we have no doubt that leave would be granted, unless the nature of the amendment might be opposed to the statute limiting the time within which actions of this character may be commenced (Union Pacific Railway v. Wyler, 158 U. S. 285, 15 Sup. Ct. 877, 39 L. Ed. 983); for, aside from the liberal provisions respecting amendments under the law of Ohio, as Judge Severens said in Hernan v. American Bridge Co., 167 Fed. 936, 93 C. C. A. 336:

"Authority vested in the federal courts to amend * * * pleadings * * * in cases brought before them is ample; probably not less so than in any other system of jurisprudence."

Inasmuch as there is now to be a new trial, the allowance of an amendment reasonably in advance of the trial would not be open to the objections which might have made it well within the discretion of the trial judge to disallow the same amendment when asked during the trial and after the case had been developed.

The judgment must be reversed, and a new trial awarded, with costs.